United States Courts
Southern District of Texas
**FILED**

MAY 1 2 2011

David J. Bradley, Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| **RICHARD W. HARVEY, SR.** ) | |
| ) | |
| **Plantiff,** ) | |
| ) | |
| **V.** ) | CIVIL ACTION: **11 CV 1815** |
| ) | |
| **MONTGOMERY COUNTY, TEXAS,** ) | **(JURY TRIAL)** |
| **BRET LIGON, TOMMY GAGE,** ) | |
| **JONATHAN DEWEY AND** ) | |
| **STEVEN ORTIZ** ) | |
| ) | |
| **Defendants** ) | |

## PLAINTIFFS' ORIGINAL COMPLAINT

### TO THE HONORABLE JUDGE OF SAID COURT:

**NOW COMES** Plaintiff, Richard W. Harvey, Sr., and files his Original Complaint,

against Defendants, Montgomery County, Texas (Montgomery County), Montgomery

County, Texas, District Attorney, Bret Ligon (District Attorney), in his individual and

official capacity, Montgomery County, Texas, Sheriff, Tommy Gage (Sheriff Gage), in

his individual and official capacity, Montgomery County, Texas, Deputy Sheriff Jonathan

Dewey (Deputy Dewey), in his individual and official capacity and Montgomery County,

Texas, Deputy Sheriff Steven Ortiz (Deputy Ortiz), in his individual and official capacity

and sets forth the following:

### JURISDICTION AND VENUE

1.     This is an action for injunctive relief and monetary damages brought

pursuant to 42 U.S.C. Sections 1983 and 1988, the First, Fourth, Fifth, Eighth and

Fourteenth Amendments to the United States Constitution, against Montgomery County,

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 1**

Texas; Montgomery County District Attorney, Bret Ligon, individually and in official capacity; Montgomery County Sheriff, Tommy Gage, individually and in official capacity; Deputy Sheriff, Jonathan Dewey, individually and in official capacity; and Deputy Sheriff, Steven Ortiz, individually and in official capacity. Jurisdiction is based upon 28 U.S.C. Sections 1331 and 1343. State law claims, if any, are brought pursuant pendant jurisdiction. Venue is proper in this Court as the events giving rise to this civil action occurred in Montgomery County, Texas, in the Southern District of Texas.

## Parties

2. Plaintiff, Richard W. Harvey, Sr. is a 58 year old, partially disabled, individual and a citizen of the United States of America, who resides at 53 Laughing Brook Court, The Woodlands, Texas 77380.

3. Defendant Montgomery County, Texas (Montgomery County), is a political sub-division of the State of Texas, duly authorized and existing pursuant with the laws of the State of Texas and can be served with process by serving its agents, Alan B. Sadler, County Judge, at 301 N. Thompson Street, Ste. 210, Conroe, Texas 77301, and David K. Walker, Montgomery County Attorney, at 207 West Phillips, Ste. 100, Conroe, Texas 77301.

4. Defendant, Bret Ligon, is the District Attorney for Montgomery County, Texas and, as such, is the chief policy maker for the Montgomery County District Attorney's Office. He may be served with process at 207 W. Phillips, 2nd Floor, Conroe, Texas 77301.

5. Defendant, Tommy Gage, is the Montgomery County, Texas, Sheriff

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 2**

(Sheriff Gage) and, as such, is the chief policy maker for the Montgomery County Sheriff's Department. He may be served with process at # 1 Criminal Justice Drive, Conroe, Texas 77301.

6.     Defendant Jonathan Dewey is a Montgomery County Deputy Sheriff (Deputy Dewey). His place of residence is unknown to Plaintiff. He may be served with process at his place of employment, the Montgomery County Sheriff's Department, 9200 Grogan's Mill Road, The Woodlands, Texas 77380.

7.     Defendant Steven Ortiz is a Montgomery County Deputy Sheriff ( Deputy Ortiz). His place of residence is unknown to Plaintiff. He may be served with legal process at his place of employment, the Montgomery County Sheriff's Department, 9200 Grogan's Mill Road, The Woodlands, Texas 77380.

## FACTS

8.     At approximately 3:30 a.m., on May 16, 2009, Plaintiff's 38 year old son, Richard Jr., made a 911 call, on Plaintiff's cordless extension telephone, wherein he requested police help, on behalf of the next door neighbor, Susie, with resolution of a minor misunderstanding, at Susie's residence, the site of an ongoing party. Richard, Jr. was very clear, and the 911 operator clearly understood a number of facts, some of which were: (1) that the problem was very minor in nature; (2) the problem was not at the Plaintiff's address; (3) that the neighbor was telling him to call the police; and (4) that he was leaving the telephone at the nextdoor neighbor's house, so she could talk to the police.  (See transcription of 911 call from May 16, 2009, a true and correct copy of which is attached hereto, marked Exhibit A, and by reference becomes a part hereof.)

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 3**

9.      At approximately 3:45 a.m., Deputy Dewey and Deputy Ortiz responded to the call.  Rather than respond to the next door neighbor's residence, as requested, the deputies decided to go to Plaintiff's residence.  It was abundantly clear, to these deputies, where the next door neighbor's residence was located, because Plaintiff lives on a corner and has only one next door neighbor.  Plaintiff was sleeping and did not know of any call.

10.     For privacy and safety reasons, Plaintiff had taken steps to assure that his inner yard, and approach to his private residence, meet all 4 prongs of the *Dunn* test for private curtilage, as set forth by the United States Supreme Court in *United States v. Dunn*, 480 U.S. 294 (1987).   Plaintiff's curtilage is within the Fourth Amendment's protective ambit.  This fact would be plainly obvious to any reasonable police officer.

11.     Plaintiff's residential property consists of a house, a garage, an inner yard and an outer yard.  The inner and outer yards are separated, in the front, by a tall brick security fence with trees, shrubs and vines obscuring the view of Plaintiff's home from passersby.  The only entry to Plaintiff's private curtilage is visa vi a gate that is made of steel bars covered with wire and plexiglass (see Exhibit D, attached hereto).  The gate is situtated so as to give visitors a limited view of anything inside of Plaintiff's private curtilage area. There is a dusk to dawn security light above the gate, a remote controlled electric locking mechanism (that can be operated from in side the house to open the gate) and an intercom with doorbell button.  (See surveyor's diagram of plaintiff's property, marked Exhibit B; two photographs taken inside Plaintiff's private curtilage area in May, 2009, marked Exhibit C and; two photographs of Plaintiffs property, taken in May, 2009, one taken from the street, looking a Plaintiff's home and

**PLAINTIFF'S ORIGINAL COMPLAINT**                         **PAGE 4**

one photo looking at his security gate, as the deputies viewed it from the outside, marked Exhibit D.  True and correct copies of Exhibits B, C, and D, are attached hereto and, by reference, become a part hereof.

12.     Under normal circumstances, all unauthorized persons (this includes, but is not limited to, friends, sales persons,  mail persons, delivery individuals, neighbors, meter readers, police officials, process servers, girl scouts, etc...) wishing to gain entrance to Plaintiff's private curtilage area, for any reason,  are expected to approach the security gate, press the doorbell/intercom button and wait for a response from inside of the home.  Nobody is free to enter the security gate, in the absence of permission or a serious emergency; and nobody ever did so, until Defendants did so, at 3:46 a.m. on May 16. 2009.

13.     On Saturday morning, May 16, 2009, at approximately 3:46 a.m., Defendants Jonathan Dewey and Steven Ortiz, acting upon authority granted them by their employer, the Montgomery County Sheriff's Department, acting under color of state law, and acting: (1) without consent, (2) without a warrant, and (3) without probable cause and exigent circumstances, as required by law, approached and illegally entered Plaintiff's private curtilage property , covertly began surveillance of Plaintiff and his wife, inside of their own home, by attempting to listen to a conversation that was going on inside of Plaintiff's house, by peeping into windows of the home and observing Plaintiff and his wife, through gaps under closed blinds; thus violating Plaintiff's Fourth Amendment right to be secure in his home.

14.     A simple viewing of Exhibits A, B, C and D, previously referenced

**PLAINTIFF'S ORIGINAL COMPLAINT**          **PAGE 5**

above, proves that Plaintiff's, property, behind his security gate and extending to his house is, in fact, Plaintiff's private curtilage area that falls under the protective ambit of the Fourth Amendment , as described in *Dunn* and, Exhibit A, in particular, proves that the deputies had no exigent circumstances that would rise to the level necessary to enter a citizen's home without a warrant and no probable cause to suspect that a crime was being, or had been committed.  These acts were clearly perpetrated, by Defendants, in clear violation of the United States Constitution and prevailing Texas Law.   Citing: *McNairy v. State*, 835 S.W.2d 101, 106 (Tex. Crim. App.;1991); McGee v. State, 154 S.W.3d 609, 615 (Tex Crim. App. 2003); Estrada v. State, 154 S.W.3d 604 (Tex. Crim. App. 2005); *Kirk v. Louisiana*, 536 U.S. (2001); *Payton v. New York*, 445 U.S. 573, 590 (1980);  "Our opinion today simply reinforces what most police officers in Texas assuredly already know- they need a warrant, consent or probable cause and exigent circumstances to lawfully enter a person's home." State V. Steelman, 16 S.W.3d 483 (Tex. Crim. App.-Eastland 2000).

15.      When Plaintiff ultimately discovered the presence of the Defendants, Plaintiff performed the following acts:

      a.   stepped outside of his front door onto his 4ft x 5ft front porch;

      b.   observed that 2, fully armed, deputies were inside his gate;

      c.   asked Defendants what they were doing in his private area;

      d.   advised Defendants that he was the homeowner;

      e.   complained to the Defendants about their illegal search of his property;

      f.   advised Defendants that they were at the wrong address;

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 6**

g.  ordered the Defendants to leave the property, after they had refused to leave, when asked politely, to do so;

h.  told Defendants that Plaintiff was going to go into his house and call the Sheriff to complain, after Defendants refused to identify their superior;

i.  turned his back to the Defendants and proceeded to go into his home to get a telephone with which to call the Sheriff, after previously warning Defendants of the fact that he was going to take this action, if they did not leave his private property;

16.     At that time, Deputy Dewey and/or Deputy Ortiz never told Plaintiff, that either of them would like to arrest or detain, said Plaintiff.   Plaintiff had no clue that he was in imminent danger of physical harm, at the hands of the deputies.

17.     As a result of Plaintiff's verbal complaints and threat that he was going to retreat into his home and call the Sheriff to complain, the deputies seemed to become enraged..

18.     Upon turning his back, opening his glass storm door and placing one foot into his home, suddenly and without any warning, Defendants, Deputy Dewey and Deputy Ortiz, physically attacked Plaintiff.

19.     Plaintiff was physically unable to, and did not, resist the Defendants physical actions, in any way; other than retorting, "What are you doing".

20.     Plaintiff was pulled from his own home, physically assaulted by the deputies, from behind, elevated off of his feet, thrown from his porch, through the air,

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 7**

onto the ground, pavestones and flagstone near his pond. Plaintiff's right knee struck a pavestone, his abdomen struck the turf and his head struck the flagstone at the edge of his pond. As a result of Defendants illegal actions, Plaintiff was temporarily stunned, dazed, in pain, bleeding and laying in a face down, prone position. Deputy Dewey (an individual who weighed in excess of 320lbs) did a "belly flop" on the back of Plaintiff's defenseless body. This action directly caused a very serious injury to Plaintiff's abdominal wall.

21.     With Deputy Dewey's heavy body laying on him, Plaintiff could not breathe, was in severe pain and had pain very similar to the pain Plaintiff had felt when he had a heart attack, just 2 months prior.  Therefore; Plaintiff told Deputy Dewey that he could not breathe and felt like he was having another heart attack.

22.     Deputy Dewey got his body off of Plaintiff, still putting pressure on Plaintiff's neck, to the extent that Deputy Ortiz was able to grab Plaintiff's right arm and force it to behind Plaintiff's back.. Deputy Ortiz then forced Plaintiff's hand up his back to a point beyond Plaintiff's medical range of motion.  This caused Plaintiff severe, excruciating pain. Plaintiff then began screaming.

23.     Plaintiff had right shoulder surgery in 2005, wherein, his supraspinatus tendon was surgically severed from the bone, shortened and re-attached to the bone with bone screws.  This surgery cause Plaintiff to be unable to move his right hand above the lower part of his buttocks, without pain.  The higher up his back, that his hand is placed, the greater the level of pain.  Plaintiff has a permanent disability in the range of motion for that shoulder.

24.     After forcing Plaintiff's right hand far up his back, Defendant, Deputy

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 8**

Ortiz placed handcuffs onto Plaintiff's wrists, behind his back, thereby forcing Plaintiff to remain in a position that causes him extreme pain. That was the first time in 56 years of life that Plaintiff had been placed into handcuffs, for any reason.

25.    Plaintiff, was left on the ground, with handcuffs in place behind his back, bleeding, potentially dying from a heart attack, defenseless, screaming for help, near delirious from the severe pain, crying and praying, for over one hour of time.

26.    Neither, Deputy Dewey, nor Deputy Ortiz displayed the basic human courtesy, nor followed the law that law requires law enforcement officers to show to any suspect who is under their control and in custody.  They coldly ignored Plaintiff's pleas for mercy.  (Citing: *Hare v. City of Corinth, Miss.* 74 F.3d 633, 648-49 (5th Cir. 1996). "Arrestees have a right to reasonable medical care and to be secure in their basic human needs such as medical care and safety".

27.    When Plaintiff was finally picked up off of the ground, still in handcuffs, he was taken to the street and placed into the back of a waiting squad car.  After some delay, Plaintiff was driven, by Deputy Ortiz, very slowly,  to a hospital emergency room and  later, released from custody. According to the hospital, Plaintiff arrived at 5:14 a.m. on May 16, 2009.  Deputy Ortiz did not make an emergency run to the hospital.

28. Plaintiff began his complaints about a potentially fatal heart attack at approximately 3:54 a.m.; yet Defendants kept Plaintiff in custody with handcuffs behind his back and did not present him to the emergency room for treatment until 5:14 a.m. That is 1 hour and 20 minutes after Defendants were aware of a potentially life threatening situation.  If Plaintiff had died of a heart attack, that night, Plaintiff would not

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 9**

be making these allegations about Defendants, today.

29. Defendants had very much to gain and not much to loose, if Plaintiff had just died before he got to the hospital. That is why Deputy Ortiz never turned on his emergency lights and delayed Plaintiff's arrival to the hospital. It was in Defendants interest that Plaintiff not arrive alive. Unfortunately for them, he did.

30.     On May 16, 2009, Plaintiff was not taken to any jail, nor charged with any crime. He was assaulted, illegally arrested, very lost his life and kidnapped by the Montgomery County Sheriff's Department.

31.     After the assault, the Defendants, Deputy Dewey and Ortiz were communicating with Assistant District Attorney Ward. They were conspiring together, against Plaintiff, to fabricate some reasoning that would justify their unconstitutional activity. On his official recording, Deputy Dewey says, "we have to take action on the use of force". He knew that what they had done was not legal, and now they needed to legally justify the use of force, after the fact. Obviously, the Plaintiff had done nothing more than complain about an unconstitutional search of his property. Under these circumstances, the Plaintiff's use of speech is not a crime and any use of force is clearly excessive. The District Attorney's representative was very helpful to the deputies; indicating that he would accept charges of interference with public duty, if Plaintiff did not go to the hospital; however, if he did, they would have to do something else.

32.     Plaintiff subsequently filed an oral complaint and a written, sworn complaint with the Internal Affairs Department of the Montgomery County Sheriff's Department, on May 21, 2009, concerning the incident of May 16, 2009 and complained

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 10**

to the District Attorney, both verbally and via electronic written communication.

33.     Prior to making the official sworn complaint, representatives of the Montgomery County Sheriff's Department made veiled and direct attempts to coerce Plaintiff into not filing his sworn complaint.

34.     When these efforts at coercion proved unsuccessful, Defendant Montgomery County, once again, turned to the Montgomery County District Attorney for assistance in discrediting Plaintiff's sworn complaint.

35.     On June 26, 2009, exactly 41days after the incident, a criminal complaint and arrest warrant were filed for record with the Montgomery County Clerk's Office by the District Attorney. He had charged Plaintiff with one count of Misdemeanor Evading Detention. This crime is punishable by a substantial fine and/or imprisonment in the County Jail for up to 6 months. Bond was set at five hundred dollars.

36. This was an act of blatant retaliation, against Plaintiff, that was personally and professionally, sanctioned by Montgomery County District Attorney, Bret Ligon. In fact, Plaintiff was in an office with Bret Ligon, his first assistant, Phil Grant and chief investigator Chris Smith, having a meeting about Plaintiff's concerns with the danger to the public that was being presented by Deputies Dewey and Ortiz, when Plaintiff was personally advised that the retaliation was taking place. Bret Ligon told Plaintiff that he did not like Plaintiff, personally and that Plaintiff was obviously, an uneducated man. Plaintiff was advised by Phil Grant that the District Attorney's Office had obtained a warrant for his arrest for evading detention. It took 41 days to file evading charges.

37. Upon hearing that he was wanted, by the District Attorney, Plaintiff extended

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 11**

his hands for cuffing by Chris Smith (a certified Peace Officer) who was present in the meeting.  Smith had on a badge, a pistol and handcuffs.  In spite of the fact that he had sanctioned bringing of these false charges against Plaintiff and Plaintiff's plain desire to surrender; the District Attorney told Plaintiff to leave the office, get a bail bond and surrender at the jail.  The District Attorney also told Smith to **"call down to the jail and tell them not to beat Mr. Harvey when he comes in to surrender"**.  Apparently, beating is customary at the Montgomery County Jail, and the District Attorney is well aware of such activity; yet he does nothing to stop this illegal activity.  Plaintiff left the meeting, contacted a bail bondsman, went to the jail and surrendered.

38.     Plaintiff incurred ten thousand dollars in criminal defense fees.

39.     On October 19, 2010, one year, five months and three days after the incident, the Montgomery County District Attorney's Office moved Montgomery County Court At Law, # 4, to dismiss the charge against Plaintiff.  The motion was granted and the criminal charges were dismissed.

40.     After all of this, (1) 16 months of relentless pursecution of an innocent, injured citizen, whom the District Attorney, personally, knew was innocent and the victim of violent crime; (2) using all of his legal skills and position in an attempt to get Plaintiff to plead guilty to a crime that he did not commit; (3) attempting and failing to have Plaintiff declared mentally incompetent to stand trial; (4) the Judge would no longer grant the District Attorney more delays; and (5) Plaintiff's pre-trial Motion to Dismiss, for the constitutional violations of Plaintiff's rights, complained of in the instant action, was about to be argued before the Court; the Montgomery County District Attorney ,

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 12**

with indisputable evidence that Plaintiff's constitutional rights had, in fact, been violated on May 16, 2009, just as Plaintiff had claimed; the District Attorney decided to file a MOTION TO DISMISS. He represented to the Court that further prosecution of Plaintiff was, "not in the interest of justice".

41.    In December of 2010, Plaintiff underwent major abdominal surgery, in an attempt to have repairs made to some of the damages caused by Defendants,  . This surgery was unsuccessful.

42.    Plaintiff is now faced with the necessity of having total abdominal wall reconstructive surgery to repair the damages caused by said Defendants.

43.    Plaintiff was examined by a leading medical expert. This physician is a re-constructive plastic surgeon and he states that this proposed surgery:

    a.   is medically necessary,

    b.   is very serious,

    c.   has a very high failure rate,

    d.   is very expensive,

    e.   is an 8 to 10 hour procedure,

    f.   requires 2 surgeons working simultaneously,

    g.   may result in significant pain for life,

    h.   makes a person unable to perform significant work for a very long period of time.

44.    On April 19, 2011, Plaintiff received a Certified Letter, written on the letterhead of Sheriff Gage, wherein, is stated the following, " The allegation along

**PLAINTIFF'S ORIGINAL COMPLAINT**                     **PAGE 13**

with several policy violations were presented in this investigation. A review of all the information by Chief Deputy W. R. McDaniel was conducted. Chief Deputy McDaniel concluded from that review that the case have a disposition of "exonerated".".

45.    Tommy Gage is the sheriff of Montgomery County, Texas, is in charge of the Sheriff's Department and is the chief policymaker for that department. The same fact apply to the District Attorney and his office. Sheriff Gage and the District Attorney have been aware that a number of Deputies conduct unconstitutional searches of citizens property and use excessive force against citizens long before Deputy Dewey and Deputy Ortiz came to Richard Harvey Sr.'s home in the middle of the night and nearly killed him without any lawful reason to do so. They condone such activity, routinely.

46.    This is not a unique or new situation in Montgomery County. Illegal search, illegal seizure, excessive force and/ or deadly force and fraudulent prosecution, are the standard operating procedures for the Montgomery County Sheriff's Department and the District Attorney's Office, routinely, assists in the illegal acts and look the other way.

47.    When these types of crimes continue to happen; Montgomery County, the District Attorney and Sheriff Gage, just continue to condone the policy. There is an implied policy that officers of the law will not be punished or prosecuted for such acts.

48.    In Montgomery County, Texas, Deputies act as though there is no constitution and they will do as they please. This sort of activity is, in fact, the policy.

49.    When, in an effort to avoid this litigation, Plaintiff asked Sheriff Gage to simply pay for the damage to Plaintiff's body, caused by the illegal actions of his deputies, Sheriff Gage refused and stated, "You do what you have to do and I will do

**PLAINTIFF'S ORIGINAL COMPLAINT**              **PAGE 14**

what I have to do".  What he had to do was "exonerate" the deputies because, after extensive investigation, his department concluded that the deputies acted in accordance with Departmental customs, rules and policy.

50.    The District Attorney thinks and acts like he is above the law because the standard of proof for deliberate indifference is so high.  In this case, Plaintiff will prove that he acted unconstitutionally,  with deliberate indifference, and does so, on a routine basis..

51.    Montgomery County Sheriff's Deputies perform these sorts of illegal activities, over and over again, because such activities are condoned, and otherwise approved of, by Montgomery County and the District Attorney.

52.    Montgomery County, the District Attorney, Sheriff Gage, Deputy Dewey and Deputy Ortiz, acted illegally, as set forth above, under color of law and with deliberate indifference to the constitutional rights of Plaintiff and others like him.

53. The actions described above, by Montgomery County, and the Montgomery County District Attorney, are illegal, immoral and repugnant to all law abiding citizens of the United States of America.

## COUNT—42 U.S.C. SECTION 1983

54. Plaintiff claims damages for the injuries set forth above under 42 U.S.C. section 1983 against Defendant Montgomery County, the Montgomery County District Attorney, Bret Ligon, Sheriff Gage, Deputy Dewey and Deputy Ortiz for violation of constitutional rights under color of law by (1) intentionally making illegal entry upon

Plaintiff's private curtilage area; (2) intentionally conducting illegal surveillance of Plaintiff and his wife; (3) illegally performing a *de facto* arrest of Plaintiff because of speech only; (4) by using illegal excessive force that directly resulted in serious personal injury to Plaintiff; (5) by intentionally failing to provide reasonable medical care to Plaintiff, in a timely manner; (6) by illegally attempting to murder Plaintiff, while in custody; (7) by attempting to coerce Plaintiff not to file a complaint; (8) by retaliation against Plaintiff for filing said complaint; and (9) by conspiring with the Montgomery County District Attorney's office to accomplish said retaliation in the form of , incarceration in the Montgomery County Jail, bringing of fraudulent charges of evading detention and fraudulently prosecuting Plaintiff for 16 months, for a crime that Montgomery County and the District Attorney knew he did not commit.

55.    All of the aforementioned illegal acts were perpetrated, by Defendants and against Plaintiff, in direct violation of his rights, secured by the First, Forth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, with deliberate indifference to any of these constitutional rights.  The deliberate indifference and the injuries to Plaintiff, had a causal connection.  *Thompson v. Upshur County, Texas*, 245 F.3d 447, 457 (5th Cir. 2001). [D]eliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.  *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003). The evil intent of deliberate indifference can be inferred from the acts of state actor. *Hope v. Pelzer*, 536 U.S. 730 (2002).  Arrestees have a right to reasonable medical care and to be secure in their basic human needs such as medical care and safety.  *Hare v. City*

*of Corinth, Miss.* 74 F.3d 633, 648-49 (5th Cir. 1996).

56.     As a direct result of Defendants excessive use of force, Plaintiff has an injury that directly and only resulted from a use of force that was clearly excessive and the excessiveness of which was clearly unreasonable.  Citing: Tarver, 410 F.3d at 751; Goodson, 202 F.3d at 740.  Plaintiff's claim for personal injury against Defendants is more than de minimis.

57.     Plaintiff had Forth, Fifth, Eighth and Fourteenth Amendment rights not to be attacked, pulled out of his home and assaulted by Defendants.  The Defendants are responsible for the personal injury and all other harm that they caused to Plaintiff as a result of their unconstitutional conduct on May 16, 2009, at his home and afterwards. *Bodine v. Warwick*, 72 F.3d 393, 400 n. 10 (3d Cir 1995) Officers who detain a suspect unlawfully should be liable for the harm proximately caused by their tortuous detention, but this will not include all harm resulting from the otherwise reasonable use of force to carry out the detention.

58.     The unconstitutional actions taken by Defendant Montgomery County, against Plaintiff, from May 16, 2009 through  current April 28, 2011, include, but are not limited to, all of the complaints listed above, and in addition,  retaliation, conspiracy to deprive Plaintiff of his liberty, deprivation of liberty and conspiracy to effect fraudulent prosecution, and fraudulent prosecution causing a second deprivation of liberty.

59.     Montgomery County, Montgomery County District Attorney, Bret Ligon and Sheriff Gage are liable under 42 U.S.C Section 1983 for damages and injunctive relief for permitting, ignoring and condoning, deputies delay in providing adequate

medical assistance for the protection of the health or safety of wards;  permitting, ignoring and condoning, deputies excessive use of force; permitting, ignoring and condoning, deputies performance of illegal search; for permitting, ignoring and condoning, deputies performance of illegal seizure; for permitting, ignoring and condoning, obviously false, deputy statements that lead to fraudulent prosecutions of innocent citizens; fraudulent prosecution of innocent citizens, permitting, ignoring and condoning constitutional violations by deputies, permitting, ignoring and condoning acts by employees that deprive innocent citizens of their constitutional rights to be free, of incarceration, pain and torture, failure to properly train deputies in the proper use of force; lax supervision; failure to report, investigate and reprimand deputy wrongful conduct.

60.     The outrageous, illegal, deprivations of constitutional rights, described in this Complaint, were inflicted upon Plaintiff, with deliberate indifference to his rights, due to official custom(s), practice(s), and/or  policy(ies) of Montgomery County, Sheriff Gage and the District Attorney.

**Excessive Force**

61.     Montgomery County, by and through Sheriff Gage and it's employees, subjected Plaintiff, to excessive force, a Fourth Amendment violation, actionable under 42 U.S.C. Section 1983, by violently hurling him through the air to the ground, smashing his right knee, causing blood to flow outside of Plaintiff's body, jumping on defendant's defenseless, prone, facedown, body and squashing his abdominal contents to the extent that Plaintiff's abdominal wall is destroyed, and pulling Plaintiff's right arm behind his

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 18**

back beyond his medical range of motion   Montgomery County failed to properly investigate discipline, supervise and train its deputies in proper use of force.  The force they used on Plaintiff was in great excess to that necessary to cause him to submit to arrest.  These custom(s), practice(s) and/or policy(ies) were a legal cause of Plaintiff's injuries, and Montgomery County's deputies (employees) acted in accord with this custom, policy and/or practice and acted with deliberate indifference to the rights and needs of persons such as Plaintiff.

## Conclusion

62.     As shown above, Defendants, Montgomery County, Texas, the Montgomery County District Attorney, Bret Ligon, Montgomery County Sheriff, Tommy Gage, Deputy Sheriff Jonathan Dewey and Deputy Sheriff Steven Ortiz, did affirmatively act, under color of Texas Law, to deprive Plaintiff of certain rights that are expressly secured by the First, Fourth, Fifth, Eighth and Fourteenth  Amendments of the United States Constitution and contrary to Article 1, Sections 9 and 19 of the Constitution of the State of Texas.

63.     The unconstitutional actions of Defendants, against Plaintiff, have directly caused Plaintiff to suffer serious, expensive and permanent damage to his body, mental anguish, fraudulent arrest, continuing severe pain and suffering,  loss of income, loss of future income, medical expenses, future medical expenses  loss of sleep, bail bond expense and extensive legal defense expenses.

## MENTAL ANGUISH

64. Defendants acts inflicted mental anguish to Plaintiff.  Defendants caused

**PLAINTIFF'S ORIGINAL COMPLAINT**                    **PAGE 19**

Plaintiff mental anguish of at least depression, anger, remorse loss of sleep, fear, fear of impending death and feelings of hopelessness for which Plaintiff seeks compensation.

## PUNITIVE DAMAGES

65. Plaintiff is entitled to punitive damages against all individual (natural persons) defendants in their individual capacities due to malice, gross negligence and purposeful acts in violation of rights guaranteed by the United States Constitution.

## PAIN AND SUFFERING

66.     Defendants acts have caused Plaintiff severe and continuing physical pain and suffering for which Plaintiff seeks just compensation.

## CRIMINAL LEGAL DEFENSE EXPENSES

67. Plaintiff seeks to recover all the money that he spent for his criminal defense attorney and the cost of his bail bond. These expenses are a direct result of the unconstitutional acts of the Defendants as shown above.

## ATTORNEY'S FEES

68.     Plaintiff seeks reasonable attorney fees, costs of litigation and expenses Under 42 U.S.C. Sections 1983 and 1988.

## JURY TRIAL

69.     Plaintiff hereby, demands a jury trial.

## INJUNCTIVE RELIEF

70.     Plaintiff requests injunctive relief against defendants, as set forth below, against all defendants for the constitutional violations and improper policies, practices, customs and procedures set forth above.

**PLAINTIFF'S ORIGINAL COMPLAINT**          **PAGE 20**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that a hearing immediately be held on Plaintiff's Motion

to Preserve Evidence, a true and correct copy of which is attached hereto and by

reference becomes a part hereof, and that be granted and that upon final trial of this

matter that judgment be entered for the Plaintiff and against Defendants jointly and

severally and that the Court specifically;

     a        Award compensatory damages to Plaintiff against the Defendants;

     b.       Award past medical expenses to Plaintiff against the Defendants;

     c.       Award future medical expenses to Plaintiff against the Defendants;

     d.       Award past lost wages to Plaintiff against the Defendants;

     e.       Award future lost wages to Plaintiff against the Defendants;

     f.       Award costs and expenses of this action to the Plaintiff against the

              Defendants including reasonable attorney fees and expenses and costs of

              litigation;

     g.       Award punitive damages against any and all individual Defendants to

              Plaintiff;

     h.       Award legal defense expenses and bail bond costs, plus interest, from the

              day said expenses were incurred by Plaintiff, until the date upon which,

              said interest is paid, to Plaintiff and against Defendants, for expenses

              Plaintiff incurred in defending himself against fraudulent arrest and

              prosecution for Evading Detention heretofore complained of in this

              litigation;

i.     Award pre-judgment and post judgment interest to the Plaintiff and against the Defendants;

j.     Order injunctive relief from Defendant, the Sheriff, Tommy Gage and Defendant Montgomery County, Texas under 42 USC Section 1983 in the form of ordering these Defendants to prevent the permitting, ignoring and condoning, by deputies, counselors, officers, doctors, mental health and medical personnel to delay in providing adequate medical care for those in custody of the Montgomery County Sheriff and/or any of his Deputies;

k.     Order injunctive relief from Defendant Montgomery County, under 42 USC Section 1983 in the form of proper use of force training;

l.     Order injunctive relief from Defendant, the Sheriff, Tommy Gage, Defendant, District Attorney, Bret Ligon and Defendant, Montgomery County, under 42 USC Section 1983 in the form of training to prevent failure to supervise, lax supervision, failure to report and failure to investigate;

m.    Order injunctive relief from Defendant, the Sheriff, Tommy Gage, Defendant, District Attorney, Bret Ligon and  Defendant Montgomery County, under 42 USC Section 1983 in the form of training to prevent unconstitutional search and seizure;

n.     Order injunctive relief from Defendant, District Attoney, Bret Ligon and Defendant, Montgomery County, under 42 USC Section 1983 in the form of training to prevent fraudulent prosecution.

**PLAINTIFF'S ORIGINAL COMPLAINT**                **PAGE 22**

o.     Award to a sum of monetary compensation for mental anguish to Plaintiff
       and against Defendants;

p.     Award to Plaintiff and Against all individual Defendants, a sum of
       monetary compensation as exemplary damages;

q.     Award to Plaintiff and against all Defendants, a sum of monetary
       compensation for pain and suffering;

r.     Award such other and further relief as this Court may deem appropriate.

RESPECTFULLY SUBMITTED,

Richard W. Harvey, Sr.
Plaintiff, Pro Se
53 Laughing Brook Court
The Woodlands, Texas 77380-2886
Telephone:    281.363.4857
E-mail:  harvey9252@sbcglobal.net

**PLAINTIFF'S ORIGINAL COMPLAINT**          **PAGE 23**

## CERTIFICATE OF SERVICE

I, Richard W. Harvey, Sr., do hereby certify that a true and correct copy of

Plaintiff's Original Complaint, along with all attachments thereto and  will be delivered

to all Defendants in a manner and within the time limits prescribed in F.C.J.P.R., Rule 4.

Richard W. Harvey, Sr.

## TRANSCRIPTION OF 911 CALL OF 5/16/09

| | |
|---|---|
| 911 | Ringing...911, what's the location of your emergency? |
| Caller | Ah yeah, this is 31107, (non-understandable), excuse me, Perlican. Here, hey, Susie, Susie, (knocking noise), 911 is on the phone. |
| 911 | Are you at 53 Laughing Brook? |
| Caller | No, nextdoor neighbor, neighbor. |
| 911 | What's going on next door? |
| Caller | I don't know what's going on, they, they won't answer the phone.  I don't know what's going on, but, they're here, and they're ready for the police. |
| 911 | What do you mean, they're ready for the police? |
| Caller | I don't know..., I mean..., you have to ask them. |
| 911 | Are they telling you to call the police? |
| Caller | Hello. |
| 911 | I'm here. |
| Caller | Yeah. |
| 911 | Are they telling you to call the police, or what? |
| Caller | Yeah, they are telling me to call the police? |
| 911 | You're neighbors are? |
| Caller | Yeah. |
| 911 | Did they tell you why? |
| Caller | Yeah, because I was laying there in her bedroom. |
| 911 | Because you were laying her bedroom.  You were laying in you're neighbor's bedroom? |

**911 Call Transcription, Page 1**

*EXHIBIT A*
*(Page 1)*

| | |
|---|---|
| Caller | No, I was in there, laying there, and they're not responding, so, I guess they will respond when the police get here. |
| 911 | O.K., why were you trying to get into their house? |
| Caller | I wasn't…get into their house?  This is my neighbor.  I'm laying there so I can lay my head…, I'm not trying to get into their house. |
| 911 | Oh, O.K., … |
| Caller | It's not like a big mystery break-in. |
| 911 | …Was it a misunderstanding? |
| Caller | Yes. |
| 911 | What's your name? |
| Caller | I'm Richard. |
| 911 | Richard, what's your last name? |
| Caller | Yeah, I'm going to let you talk to them.  They're right here, but, they refuse to answer the phone.  I'm leaving the phone right here.  I'm trying to get them to open the door.  I'm leaving the phone right here.  There you go, 911 is on the phone. |
| 911 | Hello, Hello, Hello.  (background noise and voices) |
| | The call is disconnected. |
| 911 | …ringing answered by machine. |
| Machine | Hello, this is Richard, the electrician… |
| | This call is disconnected by 911. |

911 Call Transcription, Page 2

EXHIBIT A
(Page 2)



HIGH OAKS CIRCLE

(60' R.O.W.)

EXHIBIT B

No Scale




EXHIBIT C





EXHIBIT  D