## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **RICHARD W. HARVEY, SR.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | |
| | § | |
| **MONTGOMERY COUNTY, TEXAS,** | § | Civ. No. 11-CV-1815 |
| **BRETT LIGON, TOMMY GAGE,** | § | |
| **JONATHAN DEWEY, and** | § | |
| **STEVEN ORTIZ** | § | |
| | § | |
| **Defendants.** | § | |

---

## MEMORANDUM AND ORDER

---

Before the Court is Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and (6) and Brief in Support, and Montgomery County, Texas's Motion to Dismiss Brett Ligon, Tommy Gage, Jonathan Dewey and Steven Ortiz Pursuant to Tex. Civ. Prac. & Rem. Code § 101.106 and Brief in Support and, Alternatively, Motion for a More Definite Statement ("Motion"). (Doc. No. 14.) After examining the Motion, all responses and replies thereto, and the applicable law, the Court concludes that, were the Plaintiff Richard W. Harvey ("Harvey" or "Plaintiff") not proceeding *pro se*, the Motion would be granted in part and denied in part. As Harvey is proceeding *pro se*, however, the Court will grant Harvey leave to amend in order to conform his Complaint to the standards outlined in this Memorandum and Order. Defendants' Motion is **DENIED** without prejudice to refiling once Harvey has filed his Amended Complaint.

1

## I. BACKGROUND

This lawsuit arises from an incident involving two Montgomery County Deputy Sheriffs. At approximately 3:30 a.m. on May 16, 2009, Harvey's son made a 9-1-1 telephone call from Harvey's cordless telephone. (Compl. ¶ 8.) At the time of the telephone call, Harvey's son was at a neighbor's house, where he was requesting assistance on behalf of the neighbor. (*Id.*) According to Harvey, his son "was very clear, and the 911 operator clearly understood a number of facts, some of which were: (1) that the problem was very minor in nature; (2) the problem was not at the Plaintiff's address; (3) that the neighbor was telling him to call the police; and (4) that he was leaving the telephone at the nextdoor neighbor's house, so she could talk to the police."[1] (*Id.*)

Shortly after the call, Deputy Sheriff Jonathan Dewey ("Dewey") and Deputy Sheriff Steven Ortiz ("Ortiz") (collectively, "the Deputies") arrived at Harvey's home. (*Id.* ¶ 9.) Rather than investigate the neighbor's house, the Deputies entered Harvey's property, which was protected by a security fence and only accessible through a gate made of steel bars and covered with wire and Plexiglas. (*Id.* ¶¶ 11, 13.) The Deputies began surveilling Harvey and his wife inside of their home by attempting to listen to their conversation and by "peeping into windows" through gaps in the closed blinds. (*Id.* ¶ 13.) Harvey insists that "the deputies had no exigent circumstances that would rise to the level necessary to enter a citizen's home without a warrant and no probable cause to suspect that a crime was being, or had been committed." (*Id.* ¶ 14.)

When Harvey discovered the Deputies were on his property, he stepped onto his front porch; asked the Deputies what they were doing on his private property; advised the Deputies that he was the homeowner; complained to the Deputies about their illegal

---

[1] The nature of the "problem" is not clear from the record.

search of his property; advised them that they were at the wrong address; and ordered the Deputies to leave the property. (*Id.* ¶ 15.) When the Deputies did not comply, Harvey told them that he was going to go into his house and call the Sheriff to complain. (*Id.*)

As Harvey turned his back to the Deputies to enter his home, the Deputies threw Harvey onto the ground, causing his right knee to hit a pavestone and his head to strike a flagstone. (*Id.* ¶ 18.) Dewey, who weighed in excess of 320 pounds, then "did a 'belly flop' on the back of Plaintiff's defenseless body." (*Id.* ¶ 20.) As a result, Harvey suffered considerable damage to his abdominal wall. (*Id.*)

While Dewey was on top of Harvey, Harvey started to feel that he was having a heart attack, and informed the Deputies of this. (*Id.* ¶ 21.) Dewey then got up off of Harvey, and Ortiz grabbed Harvey's right arm, forced it behind Harvey's back, and placed him in handcuffs, aggravating a pre-existing shoulder condition. (*Id.* ¶¶ 22-23.) Harvey was "left on the ground, with handcuffs in place behind his back, bleeding, potentially dying from a heart attack, defenseless, screaming for help, near delirious from the severe pain, crying and praying, for over one hour of time." (*Id.* ¶ 25.) The deputies ignored Harvey's cries for help, however. (*Id.* ¶ 26.) Ortiz eventually drove Harvey to the emergency room, but he drove "very slowly" and "did not make an emergency run to the hospital." (*Id.* ¶ 27.) Indeed, Harvey did not arrive at the emergency room until 5:14 a.m., nearly an hour and a half after he had informed the Deputies he thought he was having a heart attack. (*Id.* ¶ 28.) Harvey claims that "[i]t was in Defendants interest [sic] that Plaintiff not arrive [at the hospital] alive." (*Id.* ¶ 29.)

Harvey subsequently filed a complaint about the incident with the Internal Affairs Department at the Montgomery County Sheriff's Department. (*Id.* ¶ 32.) In addition, the

Montgomery County District Attorney filed a criminal complaint and arrest warrant against Harvey. (*Id.* ¶ 35.) The charges against Harvey were eventually dismissed, but in the interim he incurred $10,000 in attorneys' fees. (*Id.* ¶ 38-39.) Harvey also underwent major abdominal surgery to repair the damage the deputies caused. (*Id.* ¶ 41.) The surgeon informed Harvey that he would also need total abdominal wall reconstructive surgery. (*Id.* ¶ 43.)

Harvey brings this lawsuit against Montgomery County, Texas; Montgomery County District Attorney Bret Ligon ("Ligon"), individually and in his official capacity; Montgomery County Sheriff Tommy Gage ("Gage"), individually and in his official capacity; Dewey, individually and in his official capacity; and Ortiz, individually and in his official capacity (collectively, "the Defendants"). Harvey asks for injunctive relief and monetary damages pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution. Specifically, Harvey alleges that Defendants violated his constitutional rights under color of law by (1) intentionally making illegal entry upon his private curtilage area; (2) intentionally conducting illegal surveillance of him and his wife; (3) illegally performing a *de facto* arrest of Harvey because of his speech only; (4) using illegal excessive force that directly resulted in serious personal injury to Harvey; (5) intentionally failing to provide reasonable medical care to Harvey in a timely manner; (6) illegally attempting to murder Harvey while he was in custody; (7) attempting to coerce Harvey not to file a complaint; (8) retaliating against Harvey for filing the complaint; and (9) conspiring with the Montgomery County District Attorney's office to accomplish said retaliation in the form of incarceration at the Montgomery County Jail, bringing fraudulent charges of evading

4

detention and fraudulently prosecuting Harvey for 16 months for a crime Montgomery County and the District Attorney knew he did not commit. (*Id.* ¶ 54.) Harvey also emphasizes that the force used against him was excessive, and alleges that "Montgomery County failed to properly investigate[,] discipline, supervise and train its deputies in proper use of force." (*Id.* ¶ 61.)

Defendants then filed this Motion to Dismiss, seeking to dismiss all of Harvey's claims or, in the alternative, moving for a more definite statement.

## II. STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"  *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.*  A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff.  The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 129 S. Ct. at 1950 (citation omitted).  The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'"  *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)).

### III. APPLICATION

For the reasons explained below, only Harvey's claims against the Deputies for violations of his First Amendment rights and his Fourth Amendment right against excessive force would survive the Motion to Dismiss. Nonetheless, the Court will grant Harvey leave to amend his Complaint to conform to the standards outlined in this Memorandum and Order.

### A. Claims Against Montgomery County and Against Ligon, Gage, Dewey, and Ortiz in their Official Capacities

To state a claim under section 1983, "'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Texas Collin County*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)). Harvey's claims against the Defendants in their official capacities are, in effect, claims against the County. *Id.* at 373 n.6 ("Claims against officials in their official capacities are actually claims against the county.");

*Bennett v. Pippin*, 74 F.3d 578, 584-85 (5th Cir. 1996) ("We will refer to Ms. Bennett's suit against the Sheriff in his official capacity as a suit against Archer County.").

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694 (1978)). "The three attribution principles identified here—a policymaker, an official policy and the moving force of the policy—are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Id.* (internal quotations omitted). A custom or policy can stem from a policy statement formally announced by an official policymaker. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 168 (5th Cir. 2010). Alternatively, a custom or policy can be demonstrated through a "'persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'" *Id.* 168-69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)). Importantly, "[i]t is not enough that an illegal custom exist; municipal policymakers, who are the persons capable of subjecting a municipality to liability, must be chargeable with awareness of the custom." *Milam v. City of San Antonio*, 113 Fed.Appx. 622, 626 n.3 (5th Cir. 2004).

This Court has explained that "only minimal factual allegations should be required at the motion to dismiss stage" in section 1983 suits against municipalities, and "those allegations need not specifically state what the policy is, as the plaintiff will

generally not have access to it, but may be more general." *Thomas v. City of Galveston, Tx.*, No. H-10-3331, 2011 WL 3290317, at *14 (S.D. Tex. Aug. 1, 2011). However, "a plaintiff suing a municipality must provide fair notice to the defendant, and this requires more than generically restating the elements of municipal liability." *Id.* "Allegations that provide such notice could include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy." *Id.* (footnotes omitted). Harvey makes the following allegations to show that the violations against him rise to the level of a custom or policy:

- When Harvey was meeting with the District Attorney, the District Attorney told a Peace Officer to "call down to the jail and tell them not to beat Mr. Harvey when he comes in to surrender." (Compl. ¶ 37.) From this, Harvey concludes that "[a]pparently, beating is customary at the Montgomery County Jail, and the District Attorney is well aware of such activity; yet he does nothing to stop this illegal activity." (*Id.*)
- "Sheriff Gage[, the Montgomery County Sheriff,] and the District Attorney have been aware that a number of Deputies conduct unconstitutional searches of citizens [sic] property and use excessive force against citizens long before Deputy Dewey and Deputy Ortiz came to Richard Harvey Sr.'s home in the middle of the night and nearly killed him without any lawful reason to do so." (*Id.* ¶ 45.)
- "This is not a unique or new situation in Montgomery County. Illegal search, illegal seizure, excessive force and/or deadly force and fraudulent prosecution, are the standard operating procedures for the Montgomery County Sheriff's Department and the District Attorney's Office, routinely, assists in the illegal acts and look the other way." (*Id.* ¶ 46.)
- Although these types of crimes continue to happen, "Montgomery County, the District Attorney and Sheriff Gage, just continue to condone the policy." (*Id.* ¶ 47.)
- "There is an implied policy that officers of the law will not be punished or prosecuted for such acts." (*Id.*)

- "In Montgomery County, Texas, Deputies act as though there is no constitution and they will do as they please. This sort of activity is, in fact, the policy." (*Id.* ¶ 48.)
- "What [Sheriff Gage] had to do was 'exonerate' the deputies because, after extensive investigation, his department concluded that the deputies acted in accordance with Departmental customs, rules and policy." (*Id.* ¶ 49.)
- "Montgomery County Sheriff's Deputies perform these sorts of illegal activities, over and over again, because such activities are condoned, and otherwise approved of, by Montgomery County and the District Attorney." (*Id.* ¶ 51.)
- "Montgomery County failed to properly investigate discipline [sic], supervise and train its deputies in proper use of force." (*Id.* ¶ 61.)
- "These custom(s), practice(s), and/or policy(ies) were a legal cause of Plaintiff's injuries, and Montgomery County's deputies (employees) acted in accord with this custom, policy and/or practice and acted with deliberate indifference to the rights and needs of persons such as Plaintiff." (*Id.*)

Harvey's allegations remain "boilerplate," and thus do not provide Defendants fair notice of the grounds on which they are being sued. *Thomas*, 2011 WL 3290317, at *15. Harvey's most specific fact—that the District Attorney called the jail to tell them not to beat up Harvey—does not help him because Harvey never alleges that he was beaten up by anyone at the jail. Therefore, even if that sole fact were sufficient to show a policy or custom, that particular policy or custom is not the moving force behind the violations of Harvey's rights, which did not take place at the jail. *Piotrowski*, 237 F.3d at 578. Harvey's other allegations are insufficient to show a policy or custom of such violations. As a result, Harvey's claims against Montgomery County, and against Ligon, Gage, Dewey, and Ortiz in their official capacities, would not survive the Motion to Dismiss.

### B. Claim Against District Attorney Ligon in His Individual Capacity

Defendants insist that any claims against District Attorney Ligon in his individual capacity should be dismissed because he acted, if at all, solely as a prosecutor, and is

9

therefore entitled to prosecutorial immunity. (Mot. Dismiss 12.) Prosecutors are absolutely immune from section 1983 suits in their individual capacities for actions that are within the scope of their prosecutorial duties. *Brooks v. George County, Miss.*, 84 F.3d 157, 168 (5th Cir. 1996). "To determine whether prosecutorial immunity applies, we thus ask (1) whether, at the time of § 1983's enactment, the practical function of the conduct at issue merited absolute immunity, and (2) whether, at present, absolute immunity for the conduct at issue is necessary to advance the policy interests that justified the common law immunity." *Lampton v. Diaz,* 639 F.3d 223, 226 (5th Cir. 2011) (footnotes and quotations omitted).

"At the time of § 1983's enactment, common-law prosecutorial immunity extended only to conduct that is 'intimately associated with the judicial phase of the criminal process.'" *Id.* (quoting *Hoog-Watson v. Guadalupe County, Tex.*, 591 F.3d 431, 438 (5th Cir. 2009)). Policy interests justifying immunity include the fact that "the fear of suit may cause the prosecutor to 'shade his decisions instead of exercising the independence of judgment required by his public trust.'" *Id.* (quoting *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976)). Prosecutorial immunity extends to a prosecutor's action in initiating, investigating, and pursuing a criminal prosecution, as well as the decision to file or to not file criminal charges. *Quinn v. Roach*, 326 Fed.Appx. 280, 292 (5th Cir. 2009) (citing *McGruder v. Necaise*, 733 F.2d 1146, 1148 (5th Cir. 1984); *Cook v. Houston Post*, 616 F.2d 791, 793 (5th Cir. 1980); *Oliver v. Collins*, 904 F.2d 278, 281 (5th Cir. 1990)).

Harvey states the following facts concerning the District Attorney:

- "The District Attorney's representative was very helpful to the deputies; indicating that he would accept charges of interference with public duty, if Plaintiff did not go to the hospital; however, if he did, they would have to do something else." (Compl. ¶ 31.)
- "Prior to making the official sworn complaint, representatives of the Montgomery County Sheriff's Department made veiled and direct attempts to coerce Plaintiff into not filing his sworn complaint…. When these efforts at coercion proved unsuccessful, Defendant Montgomery County, once again, turned to the Montgomery County District Attorney for assistance in discrediting Plaintiff's sworn complaint." (*Id.* ¶ 33-34.)
- "On June 26, 2009, exactly 41 days after the incident, a criminal complaint and arrest warrant were filed for record with the Montgomery County Clerk's Office by the District Attorney. He had charged Plaintiff with one count of Misdemeanor Evading Detention…. This was an act of blatant retaliation, against Plaintiff, that was personally and professionally, sanctioned by Montgomery County District Attorney, Bret Ligon." (*Id.* ¶ 35-36.)
- "Plaintiff was in an office with Bret Ligon, his first assistant, Phil Grant and chief investigator Chris Smith, having a meeting about Plaintiff's concerns with the danger to the public that was being presented by Deputies Dewey and Ortiz, when Plaintiff was personally advised that the retaliation was taking place. Bret Ligon told Plaintiff that he did not like Plaintif, personally and that Plaintiff was obviously, an unedcated man. Plaintiff was advised by Phil Grant that the District Attorney's Office had obtained a warrant for his arrest for evading detention. It took 41 days to file evading charges." (*Id.* ¶ 36.)

First, any claims that Ligon conspired with Montgomery County or the Deputies are conclusory and not supported by any facts in the Complaint. Second, the claims concerning charges filed against Harvey fall squarely within the scope of prosecutorial immunity because they concern Ligon's decisions about whether to initiate, investigate, or pursue a criminal prosecution. *Quinn*, 326 Fed.Appx. at 292. Finally, Harvey does not allege that Ligon's statement, during the meeting with Harvey, violated any constitutional or statutory right. For these reasons, the claims against Ligon in his individual capacity would have to be dismissed.

### C. Claims Against Sheriff Tommy Gage in his Individual Capacity

The Defendants argue that any claims against Sheriff Gage in his individual capacity must be dismissed because Harvey does not state a claim against him. (Mot. Dismiss 13-14.) Harvey alleges the following facts with regard to Sheriff Gage:

- "On April 19, 2011 Plaintiff received a Certified Letter, written on the letterhead of Sheriff Gage, wherein, is stated the following, 'The allegation along with several policy violations were conducted in this investigation. A review of all the information by Chief Deputy W.R. McDaniel was conducted. Chief Deputy McDaniel concluded from that review that the case have a disposition of 'exonerated.'" (Compl. ¶ 44.)
- "Tommy Gage is the sheriff of Montgomery County, Texas, is in charge of the Sheriff's Department and is the chief policymaker for that department. The same fact apply [sic] to the District Attorney and his office. Sheriff Gage and the District Attorney have been aware that a number of Deputies conduct unconstitutional searches of citizens property [sic] and use excessive force against citizens long before Deputy Dewey and Deputy Ortiz came to Richard Harvey Sr.'s home in the middle of the night and nearly killed him without any lawful reason to do so. They condone such activity, routinely." (*Id.* ¶ 45.)
- "When, in an effort to avoid this litigation, Plaintiff asked Sheriff Gage to simply pay for the damage to Plaintiff's body, caused by the illegal actions of his deputies, Sheriff Gage refused and stated, 'You do what you have to do and I will do what I have to do.'" (*Id.* ¶ 49.)

The allegation that Sheriff Gage has been aware of, and has condoned, unconstitutional activities is merely conclusory. Furthermore, to state a section 1983 claim, "[a] plaintiff must establish that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation." *James*, 535 F.3d at 373 (citing *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999)). A supervisor is not normally personally liable for his subordinate's actions in which he has no involvement. *Id.* (citing *Anderson*, 184 F.3d at 443-44). Harvey's other claims against Sheriff Gage likewise fail because they do not appear to involve violations of

constitutional rights or federal statutory rights. As a result, Harvey's claims against Sheriff Gage in his individual capacity would not survive the Motion to Dismiss.

### D. Claims against Ortiz and Dewey in their Individual Capacities

"Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Flores v. City of Palacios*, 381 F.3d 391, 393-94 (5th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the defense is inapplicable. *Club Retro, LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009). "Applying this standard, we view the facts in the light most favorable to the party asserting the injury and determine (1) whether the defendant's conduct violated the plaintiff's constitutional rights, and (2) 'whether the defendant[']s conduct was objectively reasonable in light of clearly established law.'" *Blackwell v. Laque*, 275 Fed.Appx. 363, 366 (5th Cir. 2008) (quoting *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000); *Scott v. Harris*, 127 S.Ct. 1769, 1174 (2007)). "'To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions.'" *Short v. West*, --- F.3d ---, 2011 WL 5179440, at *3 (5th Cir. Nov. 2, 2011) (quoting *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007)). This Court has discretion "'in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

"'The central concept is that of fair warning: The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Juarez v. Aguilar*, 659 F.3d 495, 503 (5th Cir. 2011) (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004)). Importantly, "[w]here no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (citing *Wilson v. Layne*, 526 U.S. 603, 617-18 (1999)).

First, Harvey appears to claim that the Deputies violated his Fourth Amendment right against unreasonable searches by "approach[ing] and illegally enter[ing] Plaintiff's private curtilage property, covertly [beginning] surveillance of Plaintiff and his wife, inside of their own home, by attempting to listen to a conversation that was going on inside of Plaintiff's house, by peeping into windows of the home and observing Plaintiff and his wife, through gaps under closed blinds." (Compl. ¶ 13.) The Defendants argue, however, that if the Deputies entered and searched Harvey's curtilage area, the search was reasonable under the circumstances, as "a male had called 9-1-1 emergency dispatch and requested police to come to a residence and had stated that he was laying in someone else's bedroom where apparently he was not welcome and upon redial to the residence, there was no answer." (Mot. Dismiss 16-17.) Furthermore, Defendants point out, the Deputies had been informed, by the dispatcher, that the "male was not making any sense." (*Id.* 17; Ex. A to Mot. Dismiss, Dispatch Report, p. COU 00004.) According to Defendants, "[t]his 'search' was pursuant to a community caretaking exception to the

warrant requirement and therefore, the Plaintiff has not stated a claim that his Fourth Amendment rights were violated." (*Id.* 17.) The Defendants go on to state that, even if this Court finds that the community caretaking exception does not extend to searches of homes or curtilage areas, the officers are nonetheless entitled to qualified immunity because "the contours of this right are not clearly established." (*Id.*)

Although the Supreme Court has carved out a community caretaking exception for searches of vehicles, *Cady v. Dombrowski*, 413 U.S. 433, 439 (1973), "[t]here is some confusion among the circuits as to whether the community caretaking exception set forth in *Cady* applies to warrantless searches of homes." *Ray v. Township of Warren*, 626 F.3d 170, 175 (3rd Cir. 2010). *See, e.g., US v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) ("A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention."); *US v. Rohrig*, 98 F.3d 1506, 1520-21 (6th Cir. 1996) (finding that precedents suggest a late night disturbance of the peace might present exigent circumstances justifying warrantless searches); *US v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994) ("We agree with this line of authority holding the community caretaking exception to the warrant requirement is applicable only in cases involving automobile searches."); *US v. Erickson*, 991 F.2d 529, 531 (9th Cir. 1993) ("The fact that a police officer is performing a community caretaking function, however, cannot itself justify a warrantless search of a private residence."). Yet these cases do not simply rely on the *Cady* community caretaking doctrine; "[t]hey instead apply what appears to be a modified exigent circumstances test, with perhaps a lower threshold for exigency if the officer is acting in a community caretaking role." *Ray*, 626 F.3d at 177.

The Fifth Circuit has not addressed the issue, and Courts of Appeals disagree about whether a community caretaking exception extends to searches of homes. Therefore, the Court cannot conclude that it would have been apparent to an objectively reasonably officer that the search of Harvey's home was in violation of the law. *Id.* Indeed, from either the Dispatch Notes or the 9-1-1 call itself, an officer could have operated under a reasonable belief that there was an emergency on Harvey's property. (Ex. A to Mot. Dismiss, p. COU 0004; Ex. A to Compl., Transcription of 9/11 Call of 5/16/09.) As a result, the Deputies are entitled to qualified immunity as to Harvey's unreasonable search claim.

Second, Harvey alleges that his First Amendment rights were violated because the Deputies illegally performed "a *de facto* arrest of Plaintiff because of speech only." (Compl. ¶ 54.) "'The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.'" *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (quoting *Enlow v. Tishomingo County*, 962 F.2d 501, 509 (5th Cir. 1992)). Indeed, "'[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.'" *Id.* (quoting *Enlow*, 962 F.2d at 509). If probable cause exists, however, "any argument that the arrestee's speech as opposed to her criminal conduct was the motivation for her arrest must fail, no matter how clearly that speech may be protected by the First Amendment." *Id.* Defendants aver that the facts in Harvey's Complaint show the Deputies "did not arrest or detain him based upon his speech, but rather because Plaintiff turned his back and began to go into his house." (Mot. Dismiss 19.) The Deputies "may have feared that the Plaintiff was going to go inside to get a

weapon," they explain; regardless of their beliefs, the Defendants insist, "it is clear that

Plaintiff was not arrested or detained based upon his speech alone." (*Id.*)

With regard to his First Amendment claim, Harvey states the following facts:

- "[Plaintiff] told Defendants that Plaintiff was going to go into his house and call the Sheriff to complain, after Defendants refused to identify their superior." (Compl. ¶ 15(h).)
- "[Plaintiff] turned his back to the Defendants and proceeded to go into his home to get a telephone with which to call the Sheriff, after previously warning Defendants of the fact that he was going to take this action, if they did not leave his private property." (*Id.* ¶ 15(i).)
- "As a result of Plaintiff's verbal complaints and threat that he was going to retreat into his home and call the Sheriff to complain, the deputies seemed to become enraged." (*Id.* ¶ 17.)
- "Upon turning his back, opening his glass storm door and placing one foot into his home, suddenly and without any warning, Defendants, Deputy Dewey and Deputy Ortiz, physically attacked Plaintiff." (*Id.* ¶ 18.)

First, Harvey's claims "comprise constitutional violations" because "'the First

Amendment protects a significant amount of verbal criticism and challenge directed at

police officers.'" *Enlow*, 962 F.2d at 509 (quoting *City of Houston, Texas v. Hill*, 482

U.S. 451, 461 (1987)). In *Enlow*, the Fifth Circuit held that the plaintiff's allegation that

he was arrested after merely inquiring about the search and arrest warrant, and taking a

photograph of the Sheriff, was sufficient to state a First Amendment claim. *Id.* As in

*Enlow*, Harvey's "allegations are sufficient to state a cognizable First Amendment claim

since his speech fails to rise above inconvenience, annoyance, or unrest, or constitute an

incitement to immediate lawless action." *Id.* (internal citations and quotations omitted).

Second, there is no mention, in Harvey's facts, of a secondary reason for the arrest

beyond the speech itself. When read in the light most favorable to Harvey, the facts

suggest that the Deputies' behavior was objectively unreasonable. Therefore, the Deputies are not entitled to qualified immunity as to Harvey's First Amendment claim.

Third, Harvey asserts that the Deputies violated his Fourth Amendment right by using excessive force. The excessive use of force by a law enforcement officer on an individual "in the context of an arrest or investigatory stop" constitutes an "unreasonable seizure" of the individual, in violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must establish: (1) an injury; (2) that the injury resulted directly from the use of excessive force; and (3) that the excessiveness of the force was unreasonable." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007)). The asserted injury, however, must be more than *de minimis*. *Freeman*, 483 F.3d at 416. "The determination of whether a plaintiff's alleged injury is sufficient to support an excessive force claim is context-dependent and is 'directly related to the amount of force that is constitutionally permissible under the circumstances.'" *Id.* (quoting *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996)). Factors to consider, in assessing whether the force is "excessive" or "unreasonable," "include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Harvey alleges that the Deputies violated his Fourth Amendment right by "violently hurling him through the air to the ground, smashing his right knee, causing blood to flow outside of Plaintiff's body, jumping on defendant's defenseless, prone,

facedown, body and squashing his abdominal contents to the extent that Plaintiff's abdominal wall is destroyed, and pulling Plaintiff's right arm behind his back beyond his medical range of motion." (Compl. ¶ 61.) As a consequence of the force, Harvey claims that he was seriously injured, and required major abdominal surgery to repair the damage caused by the Deputies. (*Id.* ¶ 40.) According to Harvey's Complaint, he suffered more than a *de minimis* injury, and the injury resulted directly from the use of force. Furthermore, reading the facts in the light most favorable to Harvey, they do not clearly suggest that Harvey was attempting to flee, had committed a serious crime, or posed a threat to the Deputies' safety. Under the facts alleged in the Complaint, then, the Deputies' actions were not reasonable.

When Harvey was attacked by the Deputies, he "had a clearly established right to be free from excessive force, and it was clearly established that the amount of force that the officers could use depended on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee." *Deville*, 567 F.3d at 169. Furthermore, the Deputies' actions, according to the facts of Harvey's Complaint, were unreasonable. Therefore, the Deputies are not entitled to qualified immunity on Harvey's excessive force claim.

Fourth, Harvey alleges that the Deputies failed to provide him with reasonable medical care. As a preliminary matter, the Court notes that Harvey cannot state a claim under the Eighth Amendment because he was never convicted of a crime. *See, e.g., Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) ("The constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and unusual punishment."). Therefore, Harvey's claims under the Eighth Amendment would

not survive this Motion to Dismiss. Rather, the Court will examine Harvey's claim under the Fourteenth Amendment. *Id.* ("The constitutional rights of a pretrial detainee, on the other hand, flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment."). The Court also notes that Harvey's Fifth Amendment claims would not survive a Motion to Dismiss. The Fifth Amendment's due process protection applies to federal officials only, and Harvey has not alleged any facts to support a conclusion that either of the Deputies are federal actors. *Dunsenbery v. US*, 534 U.S. 161, 167 (2002) ("The Fourteenth Amendment's Due Process Clause and Fifth Amendment's Due Process Clause prohibit the same activity, with the Fifth simply applying to federal officials, rather than the state."); *Stafford v. Conoco, Inc.*, No. 6:08cv124, 2009 WL 2382036, at *3 (E.D. Tex. July 30, 2009) ("[T]he Fifth Amendment Due Process Clause prohibits federal action…. Plaintiff has failed to allege any facts supporting a conclusion that either defendant is a federal actor.").

Harvey states that when he was attacked by the Deputies, he "had pain very similar to the pain Plaintiff had felt when he had a heart attack, just 2 months prior." (Compl. ¶ 21.) When Harvey told the Deputies of this, Deputy Dewey got off from on top of Harvey. (*Id.*) Nonetheless, Harvey explains, he "was left on the ground, with handcuffs in place behind his back, bleeding, potentially dying from a heart attack, defenseless, screaming for help, near delirious from the severe pain, crying and praying, for over one hour of time." (*Id.* ¶ 25.) Indeed, the Deputies "coldly ignored" Harvey's "pleas for mercy." (*Id.*) Eventually, Harvey contends, he was taken the squad car and driven, "very slowly," to a hospital emergency room. (*Id.* ¶ 27.) Harvey goes on to state the following:

- "Plaintiff began his complaints about a potentially fatal heart attack at approximately 3:54 a.m.; yet Defendants kept Plaintiff in custody with handcuffs behind his back and did not present him to the emergency room for treatment until 5:14 a.m. That is 1 hour and 20 minutes after Defendants were aware of a potentially life threatening situation. If Plaintiff had died of a heart attack, that night, Plaintiff would not be making these allegations about Defendants, today." (*Id.* ¶ 28.)

- "Defendants had very much to gain and not much to loose [sic], if Plaintiff had just died before he got to the hospital. That is why Deputy Ortiz never turned on his emergency lights and delayed Plaintiff's arrival to the hospital. It was in Defendants [sic] interest that Plaintiff not arrive alive. Unfortunately for them, he did." (*Id.* ¶ 29.)

Defendants, however, point out that the Deputies did in fact drive Harvey to the hospital. (Mot. Dismiss 22.) Furthermore, "within *two minutes* of his detention, Defendant Deputies had also requested EMS to come to the scene because the Plaintiff was complaining of chest pains, and within fifteen minutes of the request, paramedics were at the scene." (*Id.* 22; Dispatch Notes, p. COU 00006; Ex. A to Reply to Mot. Dismiss, Brenda Jaszkowiak Aff. & Amy Sewell Aff.)[2] Defendants explain that Harvey does not claim "that he indeed had a heart attack or that if he had gotten to the hospital sooner, it could have saved him from further injury." (Mot. Dismiss 22.) Furthermore, according to the affidavits of the Emergency Medical Services workers, Harvey was acting belligerently at the time of their arrival and appeared to refuse treatment. (Brenda Jaszkowiak Aff. & Amy Sewell Aff.)

---

[2] On a Rule 12(b)(6) review, courts generally do not look beyond the pleadings. However, "courts may examine the complaint, documents attached to the complaint, and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s), as well as matters of public record." *Hudgens v. Allstate Texas Lloyd's*, No. H–11–2716, 2011 WL 6012602, at *2 (S.D. Tex. Dec. 1, 2011). The Court takes judicial notice of the Dispatch Notes (Doc. No. 14-1, Ex. A to Mot. Dismiss) and the affidavits from the Montgomery County Sheriff's Office Administrative Investigation (Doc. No. 21-1, Ex. A to Reply to Mot. Dismiss).

"The Due Process Clause of the Fourteenth Amendment guarantees that a person detained by the police is entitled to medical care." *Carter v. Reach*, 399 Fed.Appx. 941, 942 (5th Cir. 2010) (citing *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000)). Officers violate that right if they are deliberately indifferent to a serious illness or injury. *Id.* (citing *Jacobs*, 228 F.3d at 393). "Deliberate indifference encompasses only 'unnecessary and wanton infliction of pain' or acts 'repugnant to the conscience of mankind.'" *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)). Harvey has not pleaded facts showing that the Deputies were deliberately indifferent to a serious illness or injury. In fact, the Deputies called for immediate medical treatment, which Harvey declined. Furthermore, the Deputies took Harvey to the hospital. The Deputies are entitled to qualified immunity on Harvey's medical care claim.

Finally, Harvey contends that the Deputies illegally attempted to murder Harvey while he was in custody. Yet as Defendants have demonstrated, the Deputies called Emergency Medical Services as soon as Harvey complained of heart problems. Therefore, Harvey does not state a claim for attempted murder while in custody.

*E. Harvey's State Law Claims*

Harvey only mentions, in passing, that he may elect to bring state law claims against Defendants. Harvey does not specify particular state law claims. Defendants argue, first, that any state claims against Montgomery County must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because sovereign immunity was not waived and Montgomery County is immune from suit. (Mot. Dismiss 23.) "Governmental immunity operates like sovereign immunity to afford similar protection to subdivisions of the State, including counties, cities, and school districts." *Harris County v. Sykes*, 136

S.W.3d 635, 638 (Tex. 2004). "As a general rule, a plaintiff must show an express waiver of sovereign/governmental immunity to maintain a suit against an otherwise immune government entity." *Cardenas v. City of Laredo, Tex.*, No. L–10–12, 2011 WL 1542882, at *4 (S.D. Tex. April 21, 2011). "'Because a governmental unit is protected from suit by governmental immunity, pleadings in a suit against a governmental unit must affirmatively demonstrate, either by reference to a statute or express legislative permission, that the Legislature consented to the suit.'" *Finna Fail, LP v. Moore*, No. H–10–2045, 2010 WL 5437272, at *3 (S.D. Tex. Dec. 27, 2010) (quoting *City of Houston v. Swinerton Builders*, 233 S.W.3d 4, 10 (Tex.App.-Houston [1st Dist.] 2007, no pet.)).

The Texas Tort Claims Act (TTCA) provides for a waiver of governmental immunity under certain circumstances. *Harris County*, 136 S.W.3d at 638. Specifically, the TTCA provides:

> A governmental unit  in the state is liable for: (1)  property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if: (A)  the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or  motor-driven equipment;  and (B)  the employee would be personally liable to the claimant according to Texas law;  and (2)  personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

Tex. Civ. Prac. & Rem. Code § 101.021. Importantly, however, the TTCA also explains that:

> (b)  This chapter applies to a claim against a public agency that arises from an action of an employee of the public agency or a volunteer under direction of the public agency and that involves providing 9-1-1 service or

> responding to a 9-1-1 emergency call only if the action violates a statute or ordinance applicable to the action.

*Id.* § 101.062(b). Harvey has not pleaded, and the Court is not aware of, any statute or ordinance that was violated in this action. As a result, the Court concludes that sovereign immunity has not been waived. Therefore, Harvey's state law claims against Montgomery County would not survive the Motion to Dismiss.

The Texas Civil Practice & Remedies Code also provides that "[i]if a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Tex. Civ. Prac. & Rem. Code § 101.106(e). Thus, "[o]nce the governmental unit files a motion to dismiss the claims against its employee under section 101.106(e), the trial court must grant the motion and dismiss the claims against the employee from the suit." *Cooper v. City of Plano*, No. 4:10-CV-689, 2011 WL 4100721, at *9 (E.D. Tex. Aug. 19, 2011). Section 101.106(e) is not limited to tort claims for which the TTCA waives immunity; rather, "because the TTCA [is] the only avenue for common-law recovery against a governmental unit, all tort claims against such units were assumed to be 'under this chapter' for purposes of § 106.106." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 463 (5th Cir. 2010) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 658-59 (Tex. 2008)). Therefore, "if a plaintiff brings virtually any state common law tort claim against both a governmental unit and its employees, § 101.106(e) will allow the employee defendants to be dismissed if the governmental unit so moves." *Id. See also Freeman v. City of Fort Worth, Tex.*, No. 4:10–CV–888–Y, 2011 WL 2669111, at *10 (N.D. Tex. July 7, 2011). As Montgomery County moves that all state claims against the

remaining Defendants be dismissed, those remaining state law claims would not survive the Motion to Dismiss.

### F. Remaining Allegations

Harvey also alleges that the Defendants attempted to prevent Harvey from filing a complaint, retaliated against him for filing said complaint, and conspired with the Montgomery County District Attorney's office to accomplish that retaliation. (Compl. ¶ 54.) Harvey does not explain whether he brings these allegations as violations of constitutional law, or rather as state law violations. First, all state law claims against all Defendants have been dismissed. Second, Harvey's claims are merely conclusory. Harvey argues that "[p]rior to making the official sworn complaint, representatives of the Montgomery County Sheriff's Department made veiled and direct attempts to coerce Plaintiff into not filing his sworn complaint." (*Id.* ¶ 33.) He does not allege specific facts to support his broad allegations that representatives of the Sheriff's Department attempted to prevent him from filing his sworn complaint; nor is it clear whether the individuals who coerced him are actually among the Defendants in this lawsuit. Harvey's remaining retaliation claims appear to concern Montgomery County, which cannot be sued in the absence of a policy or custom, or fall within Ligon's prosecutorial immunity. Therefore, these claims would not survive the Motion to Dismiss.

### IV. CONCLUSION

For the reasons explained above, only Harvey's First Amendment and Fourth Amendment excessive force claims against the Deputies in their individual capacities would survive the Motion to Dismiss. Nonetheless, as Harvey is a *pro se* Plaintiff, the Court ought to grant him leave to amend his Complaint. *See Reece v. Countrywide Home*

*Loans*, 250 Fed.Appx. 91, 92 (5th Cir. 2007) ("Although Reece's claims of racial discrimination are conclusory and fail to cite supporting facts, his *pro se* status required the court to give him an opportunity to amend his complaint prior to dismissal." (internal citation omitted)); *Jones v. Greninger*, 188 F.3d 322, 326 (5th Cir. 1999) ("Generally a district court errs in dismissing a pro se complaint for failure to state a claim under Rule 12(b)(6) without giving the plaintiff an opportunity to amend."). As a result, the Court grants Harvey fourteen (14) days from the issuance of this Memorandum and Order in which to amend his Complaint solely for the purpose of conforming with the requirements outlined above. The Court denies the Defendants' Motion to Dismiss without prejudice to refiling after Harvey files his Amended Complaint.

     **IT IS SO ORDERED.**

     **SIGNED** at Houston, Texas on this the 3rd day of January, 2012.

**KEITH P. ELLISON**
**US DISTRICT COURT JUDGE**