UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **RICHARD W. HARVEY, SR.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | |
| | § | |
| **MONTGOMERY COUNTY, TEXAS,** | § | **Civ. No. 11-CV-1815** |
| **BRETT LIGON, TOMMY GAGE,** | § | |
| **JONATHAN DEWEY, and** | § | |
| **STEVEN ORTIZ,** | § | |
| | § | |
| **Defendants.** | § | |

---

**MEMORANDUM AND ORDER**

---

Before the Court is Defendants' Motion to Dismiss First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and (6) and Brief in Support, and Montgomery County, Texas's Motion to Dismiss Brett Ligon, Tommy Gage, Jonathan Dewey and Steven Ortiz Pursuant to Tex. Civ. Prac. & Rem. Code § 101.105 and Brief in Support and, Alternatively, Motion for More Definite Statement ("Motion"). (Doc. No. 34.) After considering the Motion, all responses and replies thereto, and the applicable law, the Court concludes that the Motion should be **GRANTED** in part and **DENIED** in part.

I.     FACTS

Richard W. Harvey ("Harvey" or "Plaintiff") filed this lawsuit pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution, against Montgomery County, Texas ("County"), Montgomery

County District Attorney Brett Ligon ("Ligon"), Montgomery County Sheriff Tommy Gage ("Sheriff Gage"), Montgomery County Deputy Sheriff Jonathan Dewey ("Deputy Dewey"), and Montgomery County Deputy Sheriff Steven Ortiz ("Deputy Ortiz") (collectively, "Defendants"). Plaintiff proceeds *pro se*. Defendants filed a Motion to Dismiss, which the Court granted in part and denied in part, permitting Plaintiff leave to amend. (Doc. No. 28.) Plaintiff then filed his First Amended Original Complaint ("Amended Complaint"). (Doc. No. 33.) Soon thereafter, Defendants filed this Motion. (Doc. No. 34.)

For the purposes of this Memorandum and Order only, the Court considers the well-pleaded factual allegations in the Amended Complaint to be true. At approximately 3:30 a.m. on May 16, 2009, Plaintiff's 38-year-old son made a 9-1-1 call on Plaintiff's cordless extension telephone from the home of Plaintiff's neighbor. (Am. Compl. ¶¶ 8, 11.) In the phone call, Plaintiff's son requested police help on behalf of the neighbor. (*Id.*) From the phone call, the 9-1-1 operator clearly understood that the problem was minor in nature and was not at Plaintiff's house. (*Id.* ¶ 10.) After Plaintiff's son hung up, the 9-1-1 operator tried to call back to get the correct address. (*Id.*) Because Plaintiff's son had already departed from the neighbor's house and had left the phone behind him, the operator reached Plaintiff's voicemail. (*Id.* ¶ 13.)

Deputy Dewey and Deputy Ortiz were dispatched to Plaintiff's address to resolve the issues complained of in the 9-1-1 phone call. (*Id.* ¶ 15.) When the Deputies arrived at Plaintiff's home, they saw a male approach Plaintiff's front gate, unlock it, and enter the yard, closing the gate behind him. (*Id.* ¶ 17.) Rather than speak to the male, the Deputies opened the gate and entered the yard without permission. (*Id.* ¶ 18, 21.) The Deputies

then began to covertly surveil Plaintiff and his wife by attempting to listen to their conversation and looking through the windows of the home. (*Id.* ¶ 23.) When Plaintiff noticed the Deputies, he stepped outside onto his front porch, advised them that he was the homeowner, and ordered them to leave. (*Id.* ¶ 25.) The Deputies refused to withdraw from the property, and Plaintiff told them that he was going into his house to call the Sheriff to complain. (*Id.*)

As Plaintiff turned his back and proceeded into his home to get a telephone, the Deputies physically attacked him. (*Id.* ¶¶ 25, 28.) Specifically, the Deputies threw Plaintiff through the air onto the ground, leaving Plaintiff stunned, in pain, and bleeding. (*Id.* ¶¶ 30-31.) Deputy Dewey, who weighs in excess of 300 pounds, did a "belly flop" on top of Plaintiff. (*Id.*) With Deputy Dewey's body on top of him, Plaintiff could not breathe and felt like he was having a heart attack. (*Id.* ¶ 32.) When Plaintiff informed Deputy Dewey that he was having heart pain, the Deputy told Plaintiff that he would call for medical help and got up off of Plaintiff. (*Id.*) Deputy Dewey continued to exert pressure on Plaintiff's neck, however, and Deputy Ortiz grabbed Plaintiff's right arm, forcing it behind Plaintiff's back. (*Id.* ¶ 33.) As Plaintiff had a preexisting shoulder injury, Deputy Ortiz's action caused Plaintiff excruciating pain, and Plaintiff started to scream. (*Id.* ¶¶ 33-34.) Deputy Ortiz then placed Plaintiff in handcuffs, forcing him to remain in that painful position for over an hour. (*Id.* ¶ 35.) The Deputies ignored Plaintiff's wife when she tried to explain that Plaintiff had previously had shoulder surgery. (*Id.* ¶ 40.)

Emergency Medical Technicians ("EMTs") arrived on the scene and at first promised to take Plaintiff to the hospital. (*Id.* ¶ 44.) However, the main EMT interpreted

Plaintiff's screaming and thrashing to mean that Plaintiff was somehow dangerous and refused to transport him to the hospital. (*Id.*) The EMTs did not recognize that Plaintiff was in such severe pain that he could not comply with their requests, and instead perceived his actions as a willful affront to their authority. (*Id.* ¶ 55.) When Plaintiff's wife attempted to take a photograph of the scene, an EMT told her, "[T]here better not be a picture of me and that camera," and warned, "[Y]ou had better not take any more pictures." (*Id.* ¶ 46.) After the EMTs departed, the Deputies waited as long as 15 minutes before taking Plaintiff to the hospital. (*Id.* ¶ 59.) However, the Deputies stopped at every red light and stop sign on the way to the hospital, refusing to turn on the police lights. (*Id.*)

Shortly after the incident, Plaintiff called the Sheriff's Department to complain about the Deputies' wrongful actions. (*Id.* ¶ 70.) Plaintiff received a telephone call from a sergeant, who threatened Plaintiff by telling him he would be charged with a crime if he made a formal complaint against the Deputies. (*Id.* ¶ 72.) When Plaintiff contacted the Internal Affairs Division to describe the incident, Plaintiff was told that he should carefully consider whether to make a complaint because he would be charged with felony perjury if the complaint was false. (*Id.* ¶ 73.) Similarly, Sergeant Henrici told Plaintiff that if he were making false allegations, he would probably go to jail. (*Id.* ¶ 76.) Although Sergeant Henrici went to Plaintiff's home to investigate the incident, he was not impartial. (*Id.* ¶ 82.) Sergeant Henrici did not find evidence of a forced entry even though the gate's strike plate had numerous scratches; explained that the Deputies did not want Plaintiff's wife to take photographs of the incident because the pictures might discredit the Department; and concluded that a polygraph examination of Plaintiff and the

4

Deputies would cost the Department and Montgomery County taxpayers too much money. (*Id.* ¶ 83.) When Plaintiff eventually secured a meeting with Sheriff Gage, the Sheriff stated that he would not require the Deputies to submit to a polygraph examination. (*Id.* ¶ 99.) In April 2011, Plaintiff received a letter on Sheriff Gage's letterhead stating: "The allegation along with several policy violations were presented in this investigation. A review of all the information by Chief Deputy W.R. McDaniel was conducted. Chief Deputy McDaniel concluded from that review that the case have a disposition of 'exonerated.'" (*Id.* ¶ 103.)

Plaintiff attempted to contact Ligon directly to make him aware of what had happened and to convince him to begin his own investigation. (*Id.* ¶ 78.) Ligon personally returned Plaintiff's phone call when Plaintiff was not at home, leaving a message on Plaintiff's answering machine. (*Id.* ¶ 79.) Plaintiff tried to contact Ligon several times again by phone and by fax, but did not receive another reply. (*Id.* ¶¶ 80-81.) However, a full 41 days after the incident, Ligon filed a criminal complaint and arrest warrant charging Plaintiff with one count of Misdemeanor Evading Detention. (*Id.* ¶ 86.) Around this time, Plaintiff was able to arrange an in-person meeting with Ligon. (*Id.* ¶ 89.) At the meeting, Ligon was condescending and personally insulting to Plaintiff. (*Id.* ¶ 90.) Ligon informed Plaintiff that the criminal complaint had been filed because Plaintiff was making trouble for the Sheriff's Department and because Ligon personally did not like Plaintiff. (*Id.* ¶ 91.) Plaintiff agreed at the meeting to surrender; at that point, Ligon told a peace officer present to call the jail to tell them "not to beat" Plaintiff. (*Id.* ¶ 92.) Plaintiff ended up incurring $10,000 in criminal defense fees before the charges against him were dismissed. (*Id.* ¶ 94.)

According to Plaintiff, illegal search, illegal seizure, excessive and deadly force, and fraudulent prosecution are the standard operating procedures for the Montgomery County Sheriff's Department. (*Id.* ¶ 106.) For example, in 2009, a Montgomery County citizen was tazed while he was pushing his broken motorcycle home. (*Id.* ¶ 107.) The victim filed an Internal Affairs Complaint, but the Deputy was exonerated. (*Id.*) Also in 2009, Montgomery County Deputies fatally tazed a mentally ill man. (*Id.* ¶ 109.) A Deputy was exonerated in 2010 for shooting an innocent man to death. (*Id.* ¶ 112.) Deputies arrested a homeowner in 2006 when he refused to let them search his home, the site of a Superbowl party, without a warrant. (*Id.* ¶ 113.)

The Deputies' actions have had lasting health consequences for Plaintiff. In December 2010, Plaintiff underwent major abdominal surgery to repair the damage caused by the Deputies. (*Id.* ¶ 96.) The surgery was unsuccessful, however. (*Id.*) Plaintiff was informed by his physician that he would need to have yet another surgery: namely, reconstructive surgery on his abdominal wall. (*Id.* ¶¶ 98-99.) According to Plaintiff's physician, the surgery is expensive, has a high failure rate, and entails a long recovery period. (*Id.*)

Plaintiff filed this lawsuit, bringing claims for relief against all Defendants pursuant to 42 U.S.C. §§ 1983 and 1988, as well as the First, Fourth, and Fourteenth Amendments to the United States Constitution. According to Plaintiff, Defendants violated his constitutional rights under color of law by:

- Intentionally making illegal entry upon Plaintiff's private curtilage area;

- Intentionally conducting illegal surveillance of Plaintiff and his wife;

- Illegally performing a *de facto* arrest of Plaintiff solely because of his speech;

- Using illegal excessive force that directly resulted in serious personal injury to Plaintiff;

- Illegally detaining Plaintiff, with hands cuffed behind his back, on the ground, in such a manner that he was in blinding pain, and holding him in that position for over one hour;

- Intentionally failing to provide reasonable medical care to Plaintiff in a timely manner;

- Illegally detaining Plaintiff and preventing him from receiving timely medical care for heart attack symptoms, of which they were specifically aware, while in custody;

- Attempting to coerce Plaintiff not to file a complaint;

- Retaliating against Plaintiff for filing said complaint; and

- Conspiring with the Montgomery County District Attorney's office to accomplish said retaliation in the form of incarceration in the Montgomery County Jail, bringing fraudulent charges of evading detention against him, and fraudulently prosecuting Plaintiff for 16 months for a crime the Sheriff's Department knew Plaintiff did not commit.

(*Id.* ¶ 126.) Defendants then filed their Motion, seeking to dismiss all of Plaintiff's claims against them. Defendants urge (1) all claims against the County and the Defendants in their official capacities must be dismissed because Plaintiff has failed to plead a policy or custom so as to overcome the County's immunity; (2) all claims against Ligon must be dismissed because he is entitled to prosecutorial immunity; (3) all claims against Sheriff Gage must be dismissed because Plaintiff has not pleaded facts to support any claim

against him; (4) all claims against the Deputies should be dismissed because their conduct did not violate clearly established law; and (5) all state claims should be dismissed because the County has not waived sovereign immunity, and the County moves to dismiss all state claims against the Defendants in their individual capacities pursuant to the Texas Tort Claims Act. (Mot. Dismiss at 7-8.)

## II.    LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.*  A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff.  The court must

accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 129 S. Ct. at 1950 (citation omitted).  The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'"  *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)).

## III.    ANALYSIS

The Court finds that Plaintiff has succeeded in pleading a pattern or practice of excessive force and unlawful detention. Accordingly, these claims against the County can proceed. Additionally, Plaintiff has stated a claim that the Deputies violated Plaintiff's Fourth Amendment rights against excessive force and unlawful detention, as well as Plaintiff's First Amendment rights. Finally, Plaintiff has stated a claim under the Texas Constitution, Article 1, section 9, to the extent Plaintiff seeks equitable relief.  Plaintiff's remaining claims must be dismissed.

### A.  Claims Against Montgomery County and Against Ligon, Gage, Dewey, and Ortiz in their Official Capacities

Defendants assert that all claims against the County and against the individual Defendants in their official capacities must fail because Plaintiff is unable to establish municipal liability. To state a claim under section 1983, "'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Texas Collin County*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)). Plaintiff's claims against the Defendants in their official capacities are, in effect, claims against the County.

*Id.* at 373 n.6 ("Claims against officials in their official capacities are actually claims against the county."); *Bennett v. Pippin*, 74 F.3d 578, 584-85 (5th Cir. 1996) ("We will refer to Ms. Bennett's suit against the Sheriff in his official capacity as a suit against Archer County."). "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "The three attribution principles identified here—a policymaker, an official policy and the moving force of the policy—are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Id.* (internal quotations omitted). A custom or policy can stem from a policy statement formally announced by an official policymaker. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 168 (5th Cir. 2010). Alternatively, a custom or policy can be demonstrated through a "'persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'" *Id.* at 168-69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)). Importantly, "[i]t is not enough that an illegal custom exist; municipal policymakers, who are the persons capable of subjecting a municipality to liability, must be chargeable with awareness of the custom." *Milam v. City of San Antonio*, 113 Fed.Appx. 622, 626 n.3 (5th Cir. 2004). "A customary policy consists of actions that have occurred for so long and with such frequency that the course

of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow*, 614 F.3d at 169 (citing *Webster*, 735 F.2d at 842).

This Court has explained that "only minimal factual allegations should be required at the motion to dismiss stage" in section 1983 suits against municipalities, and "those allegations need not specifically state what the policy is, as the plaintiff will generally not have access to it, but may be more general." *Thomas v. City of Galveston, Tx.*, No. H-10-3331, 2011 WL 3290317, at *14 (S.D. Tex. Aug. 1, 2011). However, "a plaintiff suing a municipality must provide fair notice to the defendant, and this requires more than genetically restating the elements of municipal liability." *Id.* "Allegations that provide such notice could include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy." *Id.* (footnotes omitted). Thus, while "[c]onclusory allegations of the existence of an unwritten policy, practice, or custom are … insufficient," *Vouchides v. Houston Community College System*, No. H–10–2559, 2011 WL 4592057, at *12 (S.D. Tex. Sept. 30, 2011) (citing *Von Eschen v. League City Texas*, 233 F.3d 575 (table), 2000 WL 1468838, at *1 (5th Cir. Sept. 8, 2000); *Schelsteder v. Montgomery Cnty., Tex.*, No. H-05-0941, 2006 WL 1117883, at *8 (S.D. Tex. April 21, 2006); *Barr v. Gee*, No. 11-10104, 2011 WL 3585815, at *7 (11th Cir. Aug. 16, 2011)), a large number of incidents may suffice to state a claim for a policy or practice, *Oporto v. City of El Paso*, No. EP-10-CV-110-KC, 2010 WL 3503457, at *5 (W.D. Tex. Sept. 2, 2010) (finding plaintiffs stated a claim of an unwritten policy, practice, or custom by alleging 32 prior incidents in which police department officers had

used excessive force). *See also Rivera v. City of San Antonio*, No. SA-06-CA-235-XR, 2006 WL 3340908, at *12 (W.D. Tex. Nov. 15, 2006) (finding allegation of hundreds of complaints against police officers, without any disciplinary action taken, was sufficient to state a claim of a municipal policy).

However, "[a] pattern requires 'sufficiently numerous prior incidents' as opposed to 'isolated instances.'" *Oporto*, 2010 WL 3503457, at *5 (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)). "Where prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Webster*, 735 F.2d at 842). In other words, the practice must be "'persistent and widespread.'" *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (quoting *Piotrowski*, 237 F.3d at 581). For example, the Fifth Circuit concluded that 27 incidents of police excessive force complaints between 2002 and 2005 would not establish excessive force because the police department employed more than 1,500 officers and reported more than 67,000 instances of crime per year. *Peterson*, 588 F.3d at 851. Similarly, the Fifth Circuit determined that eleven offense reports were not competent summary judgment evidence of a pattern of unconstitutional searches. *Pineda*, 291 F.3d at 329. Among other shortcomings, the Court of Appeals concluded that "the sample of alleged unconstitutional events [was] just too small." *Id.*

In his Amended Complaint, Plaintiff pleads factual allegations sufficient to state a claim of a policy, practice, or custom of excessive force and unlawful detention. Plaintiff

describes several specific incidents involving excessive use of force. Additionally, Plaintiff claims that there have been 200 complaints of excessive use of force and 200 complaints of unlawful detention lodged with the Montgomery County Sheriff's Department in the last ten years. Plaintiff may not be able to survive a Motion for Summary Judgment, depending on how many of these allegations proved to be meritorious, the size of the Montgomery County Sheriff's Department, and the number of crimes reported in Montgomery County in any given year. Nonetheless, these facts are sufficient to state a claim at the dismissal stage.

Plaintiff does not succeed in stating a claim of a pattern or practice on any other grounds. Although Plaintiff claims that "[i]llegal search" and "fraudulent prosecution" are also "the standard operating procedures for the Montgomery County Sheriff's Department and the District Attorney's Office," Plaintiff nowhere alleges facts supporting a policy or custom of illegal search and fraudulent prosecution. (Am. Compl. ¶ 106.) Nor does Plaintiff state facts showing a pattern or practice of First Amendment violations or interference with, or retaliation for, filing complaints against deputies. Therefore, Plaintiff cannot penetrate the County's immunity as to these claims.

Likewise, Plaintiff fails to plead facts that could give rise to a failure-to-train claim against Montgomery County. "'The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes the injury.'" *Valle v. City of Houston*, 613 F.3d 536, 544 (5th Cir. 2010) (quoting *Brown v. Bryan County, OK*, 219 F.3d 450, 457 (5th Cir. 2000)). "'In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.'" *Id.* (quoting *City of*

*Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). "A plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Id.* (citing *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010); *Pineda*, 291 F.3d at 332). "The Supreme Court has explained 'that a municipality can be liable for failure to train its employees when the municipality's failure shows a deliberate indifference to the rights of its inhabitants.'" *Sanders-Burns*, 594 F.3d at 381 (quoting *Farmer v. Brennan*, 511 U.S. 825, 840, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). "'Deliberate indifference is more than mere negligence.'" *Id.* (quoting *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000)). Rather, a plaintiff "must show that 'in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Id.* (quoting *City of Canton*, 489 U.S. at 390, 109 S.Ct. 1197). Plaintiff nowhere alleges facts that would show the municipality's training policy or procedure were inadequate, let alone facts that could state a claim that the need for more or different training is obvious. Therefore, Plaintiff cannot state a claim for failure to train.

The Court will note that Plaintiff would not be able to prevail under any other theory warranting municipal liability. Authorized policymakers' approval of a subordinate's decision and the basis for it may constitute ratification chargeable to the municipality. *Peterson*, 588 F.3d at 848 (citing *City of St. Louis v. Praprotnik*, 485 U.S.

112, 108 S.Ct. 915, 917, 95 L.Ed.2d 107 (1988)). However, Fifth Circuit "precedent has limited the theory of ratification to 'extreme factual situations.'" *Id.* (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998)). In light of Fifth Circuit guidance, the case before this Court would not constitute an extreme factual situation under the ratification theory. *Id.* (finding no extreme factual situation for the purposes of the ratification theory when excessive force was used against a plaintiff dragged from his own car while sleeping); *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (finding no extreme factual situation when police shot fleeing suspect in the back). Furthermore, "policymakers who simply go along with a subordinate's decision do not thereby vest final policymaking authority in the subordinate, nor does a mere failure to investigate the basis of a subordinate's discretionary decisions amount to such a delegation." *Milam*, 113 Fed.Appx. at 627 (quotation and citation omitted). Plaintiff does not plead facts showing that any final policymaker approved the Deputies' decision and the basis for it.

Nor would Plaintiff be able to overcome the County's immunity under the single incident exception. In certain instances, "a single action by a municipal official possessing final policymaking authority regarding the action in question constitutes the official policy of the municipality and … the determination of whether a municipal official wields final policymaking authority regarding a particular action constitutes a question of state law." *Brady v. Fort Bend County*, 145 F.3d 691, 698 (5th Cir. 1998) (citing *McMillian v. Monroe County*, 520 U.S. 781, 117 S.Ct. 1734, 1736-37, 138 L.Ed.2d 1 (1986)). The relevant inquiry is "'whether governmental officials are final policymakers for the local government *in a particular area, or on a particular issue.*'" *Id.*

at 699 (quoting *McMillan*, 117 S.Ct. at 1737). In other words, "plaintiffs can hold municipalities liable for single instances of conduct perpetrated by the policymakers themselves; such one-time conduct can represent official 'policy' even though it does not necessarily form part of a plan or rule developed to govern all like occasions." *Milam*, 113 Fed.Appx. at 626. Importantly, the single incident exception "is inherently a narrow one, and one that [the Fifth Circuit] has been reluctant to expand." *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 385 (5th Cir. 2005) (quotation and footnote omitted). "[V]iolations of criminal law are the typical circumstance in which liability is permitted" under the exception. *Ratliff v. City of Houston*, No. Civ.A.H-02-3809, 2005 WL 1745468, at *23 (S.D. Tex. July 25, 2005). The single incident exception applies in failure to train cases only when "the highly predictable consequence of a failure to train would result in the specific injury suffered, and … the failure to train represented the 'moving force' behind the constitutional violation." *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) (citation omitted). There are no facts pleaded to support the claim that the Deputies were improperly trained, let alone that the highly predictable consequence of that failure would result in the injury suffered by Plaintiff. The single incident exception is inapplicable here.

In conclusion, Plaintiff's claims against Montgomery County survive only as to his allegations of excessive force and illegal detention. All other claims against Montgomery County and against Defendants in their official capacities must be dismissed.

**B. Claims Against Ligon in his Individual Capacity**

16

Defendants insist that any claims against District Attorney Ligon in his individual capacity should be dismissed because he acted, if at all, solely as a prosecutor, and is therefore entitled to prosecutorial immunity. (Mot. Dismiss at 12.) Prosecutors are absolutely immune from section 1983 suits in their individual capacities for actions that are within the scope of their prosecutorial duties. *Brooks v. George County, Miss.*, 84 F.3d 157, 168 (5th Cir. 1996). "To determine whether prosecutorial immunity applies, we thus ask (1) whether, at the time of § 1983's enactment, the practical function of the conduct at issue merited absolute immunity, and (2) whether, at present, absolute immunity for the conduct at issue is necessary to advance the policy interests that justified the common law immunity." *Lampton v. Diaz,* 639 F.3d 223, 226 (5th Cir. 2011) (footnotes and quotations omitted). "At the time of § 1983's enactment, common-law prosecutorial immunity extended only to conduct that is 'intimately associated with the judicial phase of the criminal process.'" *Id.*  (quoting *Hoog-Watson v. Guadalupe County, Tex.*, 591 F.3d 431, 438 (5th Cir. 2009)). Policy interests justifying immunity include the fact that "the fear of suit may cause the prosecutor to 'shade his decisions instead of exercising the independence of judgment required by his public trust.'" *Id.* (quoting *Imbler v. Pachtman*, 424 U.S. 409, 423, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

Thus prosecutorial immunity extends to a prosecutor's actions in initiating, investigating, and pursuing a criminal prosecution, as well as the decision to file or to not file criminal charges. *Quinn v. Roach*, 326 Fed.Appx. 280, 292 (5th Cir. 2009) (unpublished) (citing *McGruder v. Necaise*, 733 F.2d 1146, 1148 (5th Cir. 1984); *Cook v. Houston Post*, 616 F.2d 791, 793 (5th Cir. 1980); *Oliver v. Collins*, 904 F.2d 278, 281 (5th Cir. 1990)). "To decide whether absolute immunity attaches to a particular kind of

prosecutorial activity, one must take account of the 'functional' considerations." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342, 129 S.Ct. 855, 861, 172 L.Ed.2d 706 (2009) (citing *Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991); *Kalina v. Fletcher*, 522 U.S. 118, 127, 130, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997)). Specifically, "prosecutors are absolutely immune with respect to activities that are 'intimately associated with the judicial phase of the criminal process.'" *Cousin v. Small*, 325 F.3d 627, 632-33 (5th Cir. 2003) (quoting *Burns*, 500 U.S. at 430, 96 S.Ct. 984). "Conduct falling within this category is not limited 'only to the act of initiation itself and to the conduct occurring in the courtroom,' but instead includes all actions 'which occur in the course of [the prosecutor's] role as an advocate for the State.'" *Id.* (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 272, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)).

Plaintiff's allegations concern Ligon's actions in initiating, investigating, and pursuing a criminal prosecution. Importantly, this Court must conduct its immunity analysis "with reference to whether the challenged activity falls within the category of conduct in which a prosecutor is generally authorized to engage, rather than with reference to the wrongful nature or excessiveness of the conduct." *Cousin*, 325 F.3d at 635 (citing *Kerr v. Lyford*, 171 F.3d 330, 337 (5th Cir. 1999)). "Willful or malicious prosecutorial misconduct is egregious by definition, yet prosecutors are absolutely immune from liability for such conduct if it occurs in the exercise of their advocatory function." *Id.* (citing *Imbler*, 424 U.S. at 430, 96 S.Ct. 984). The conduct Plaintiff describes may be egregious, but it falls within the scope of Ligon's prosecutorial immunity. Therefore, Plaintiff's claims against Ligon in his individual capacity fail.

### C.  Claims Against Sheriff Gage in his Individual Capacity

Defendants argue that any claims against Sheriff Gage in his individual capacity must be dismissed because Plaintiff does not state a claim against him. (Mot. Dismiss at 13-14.) According to Defendants, Plaintiff fails to allege any actions personally taken by Sheriff Gage that could have violated Plaintiff's rights. (*Id.* at 14.) To state a section 1983 claim, "[a] plaintiff must establish that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation." *James*, 535 F.3d at 373 (citing *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999)).  A supervisor is not normally personally liable for his subordinate's actions in which he has no involvement. *Id.* (citing *Anderson*, 184 F.3d at 443-44).

Nearly all of Plaintiff's allegations against Sheriff Gage are actually complaints about his supervisees' conduct, and there is no supervisory liability under section 1983. *See, e.g., Brown v. Strain*, No. 09-2813, 2010 WL 5141215, at *10 (E.D. La. Dec. 13, 2010) ("[Plaintiffs] have provided no evidence that [the sheriff] had any personal involvement with the events in question. Since there is no evidence of [the sheriff's] personal involvement in [plaintiff's] arrest and there is no vicarious liability under § 1983, the personal capacity claims against [the sheriff] must be dismissed." (citing *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983))). As an exception to this general rule, "supervisors can be liable for 'gross negligence' or 'deliberate indifference' to violations of their subordinates." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994). Under the Fifth Circuit's three-part test for supervisory liability, a "'plaintiff must show that: 1) the police chief failed to supervise or train the officer, 2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights, and 3) such failure to supervise or train amount to gross negligence or

deliberate indifference.'" *Id.* at 452-53 (quoting *Hinshaw v. Doffer*, 785 F.2d 1260, 1263 (5th Cir. 1986), *rev'd on other grounds, Martin v. Thomas*, 973 F.2d 449 (5th Cir. 1992)). Plaintiff does not offer facts to support a claim for failure to supervise or train, let alone that a causal connection would have existed between such a failure and the violation of Plaintiff's rights. Plaintiff's remaining complaints about Sheriff Gage's conduct likewise fail because they do not involve violations of constitutional rights or federal statutory rights. Therefore, Plaintiff's claims against Sheriff Gage in his individual capacity must be dismissed.

### D.  Claims Against Ortiz and Dewey in their Individual Capacities

Largely for the reasons articulated in the Court's Memorandum and Order on Defendants' first Motion to Dismiss, the Court concludes that Plaintiff has stated a claim against Ortiz and Dewey in their individual capacities for use of excessive force, for unlawful detention, and for violation of his First Amendment rights. As to all other claims against them, the Deputies are entitled to qualified immunity. "Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Flores v. City of Palacios*, 381 F.3d 391, 393-94 (5th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the defense is inapplicable. *Club Retro, LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009). "Applying this standard, we view the facts in the light most favorable to the party asserting the injury and determine (1) whether the defendant's conduct violated the

20

plaintiff's constitutional rights, and (2) 'whether the defendant[']s conduct was objectively reasonable in light of clearly established law.'" *Blackwell v. Laque*, 275 Fed.Appx. 363, 366 (5th Cir. 2008) (quoting *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000); *Scott v. Harris*, 127 S.Ct. 1769, 1174 (2007)).

"'To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions.'" *Short v. West*, --- F.3d ---, 2011 WL 5179440, at *3 (5th Cir. Nov. 2, 2011) (quoting *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007)). This Court has discretion "'in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). "'The central concept is that of fair warning: The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Juarez v. Aguilar*, 659 F.3d 495, 503 (5th Cir. 2011) (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004)). Importantly, "[w]here no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (citing *Wilson v. Layne*, 526 U.S. 603, 617-18, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

First, Plaintiff claims that the Deputies violated his Fourth Amendment right against unreasonable searches by "approach[ing] and illegally enter[ing] Plaintiff's

private curtilage property, covertly beg[ining] surveillance of Plaintiff and his wife, inside their own home, by attempting to listen to a conversation that was going on inside of Plaintiff's house, by peeping into the windows of the home and observing Plaintiff and his wife, through gaps under closed blinds." (Am. Compl. ¶ 23.) The Defendants argue, however, that even if the Deputies entered and searched Plaintiff's curtilage area, the search was reasonable under the circumstances. Defendants urge that the Deputies' actions were reasonable because "a male had called 9-1-1 emergency dispatch and requested police to come to a residence and had stated that he was laying [sic] in someone else's bedroom where apparently he was not welcome and upon redial to the residence, there was no answer." (Mot. Dismiss at 16.) Furthermore, Defendants point out, the Deputies had been informed, by the dispatcher, that the "male was not making any sense." (*Id.* at 17; Ex. A to Mot. Dismiss, Dispatch Report, p. COU 00004.)[1] According to Defendants, "[t]his 'search' was pursuant to a community caretaking exception to the warrant requirement and therefore, the Plaintiff has not stated a claim that his Fourth Amendment rights were violated." (*Id.* at 17.) Defendants go on to state that, even if this Court finds that the community caretaking exception does not extend to searches of homes or curtilage areas, the officers are nonetheless entitled to qualified immunity because "the contours of this right are not clearly established." (*Id.*)

Although the Supreme Court has carved out a community caretaking exception for searches of vehicles, *Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), "[t]here is some confusion among the circuits as to whether the

---

[1] On a Rule 12(b)(6) review, courts generally do not look beyond the pleadings. However, "courts may examine the complaint, documents attached to the complaint, and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s), as well as matters of public record." *Hudgens v. Allstate Texas Lloyd's*, No. H–11–2716, 2011 WL 6012602, at *2 (S.D. Tex. Dec. 1, 2011). The Court takes judicial notice of the Dispatch Report. (Ex. A to Mot. Dismiss.)

community caretaking exception set forth in *Cady* applies to warrantless searches of homes," *Ray v. Township of Warren*, 626 F.3d 170, 175 (3rd Cir. 2010). *See, e.g., U.S. v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) ("A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention."); *U.S. v. Rohrig*, 98 F.3d 1506, 1520-21 (6th Cir. 1996) (finding that precedents suggest a late night disturbance of the peace might present exigent circumstances justifying warrantless searches); *U.S. v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994) ("We agree with this line of authority holding the community caretaking exception to the warrant requirement is applicable only in cases involving automobile searches."); *U.S. v. Erickson*, 991 F.2d 529, 531 (9th Cir. 1993) ("The fact that a police officer is performing a community caretaking function, however, cannot itself justify a warrantless search of a private residence."). Yet these cases do not simply rely on the *Cady* community caretaking doctrine; "[t]hey instead apply what appears to be a modified exigent circumstances test, with perhaps a lower threshold for exigency if the officer is acting in a community caretaking role." *Ray*, 626 F.3d at 177.

The Fifth Circuit has not addressed the issue, and Courts of Appeals disagree about whether a community caretaking exception extends to searches of homes. Therefore, the Court cannot conclude that it would have been apparent to an objectively reasonable officer that entering Plaintiff's yard was in violation of the law. *Id*. Indeed, from either the Dispatch Notes or the 9-1-1 call itself, an officer could have operated under a reasonable belief that there was an emergency on Plaintiff's property. (Ex. A to Mot. Dismiss, p. COU 0004.) As a result, the Deputies are entitled to qualified immunity as to Plaintiff's unreasonable search claim.

23

Second, Plaintiff alleges that his First Amendment rights were violated because the Deputies illegally performed "a *de facto* arrest of Plaintiff because of speech only." (Am. Compl. ¶ 54.) The Court agrees with Plaintiff that he has stated a claim that he was *de facto* arrested. "There exist 'no scientifically precise benchmarks for distinguishing between temporary detentions and de facto arrests.'" *U.S. v. Chaney*, 647 F.3d 401, 409 (1st Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "Instead, we inquire, in light of the totality of the circumstances, whether a reasonable person in the suspect's position would have understood her position 'to be tantamount to being under arrest.'" *Id.* (quoting *U.S. v. Zapata*, 18 F.3d 971, 975 (1st Cir. 1994)); *see also U.S. v. Brown*, No. 09-73-JJB-SCR, 2010 WL 126471, at *2 (M.D. La. Jan. 8, 2010) ("[T]he custody inquiry hinges on whether a reasonable person would associate the circumstances [defendant] confronted with restraint constituting de facto arrest. The reasonable person test focuses on objective criteria and demands consideration of the totality of the circumstances." (citing *U.S. v. Bengivenga*, 845 F.2d 593, 597, 599-600 (5th Cir. 1988))). The facts Plaintiff presents—that he was forced to the ground, handcuffed for more than an hour, and placed in a patrol car—state a claim that he was *de facto* arrested. *See U.S. v. Zavala*, 541 F.3d 562, 579 (5th Cir. 2008) ("Zavala's detention, which exceeded one hour and thirty minutes, morphed from a *Terry* detention into a de facto arrest. He was handcuffed, placed in a police car, transported to different locations, and was not free to leave." (citations omitted)). *Compare U.S. v. Campa*, 234 F.3d 733, 738-39 (1st Cir. 2000) (finding that questioning by officers in apartment building hallway did not qualify as a *de facto* arrest because officers did not display weapons, use

24

handcuffs, exert any physical force, or otherwise restrain individuals more than was minimally necessary to conduct investigative questioning).

Additionally, the Court finds that Plaintiff has stated a claim that his First Amendment rights were violated by the *de facto* arrest. "'The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.'" *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (quoting *Enlow v. Tishomingo County*, 962 F.2d 501, 509 (5th Cir. 1992)). Indeed, "'[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.'" *Id.* (quoting *Enlow*, 962 F.2d at 509). If probable cause exists, however, "any argument that the arrestee's speech as opposed to her criminal conduct was the motivation for her arrest must fail, no matter how clearly that speech may be protected by the First Amendment." *Id.* Defendants aver that the facts in Plaintiff's Amended Complaint show the Deputies "did not arrest or detain him based upon his speech, but rather because Plaintiff turned his back and began to go into his house." (Mot. Dismiss at 19.) The Deputies "may have feared that the Plaintiff was going to go inside to get a weapon," they explain; regardless of the Deputies' beliefs, Defendants insist, "it is clear that Plaintiff was not arrested or detained based upon his speech alone." (*Id.*)

The Court disagrees. As in *Enlow*, Plaintiff's "allegations are sufficient to state a cognizable First Amendment claim since his speech fails to rise above inconvenience, annoyance, or unrest, or constitute an incitement to immediate lawless action." *Id.* (internal citations and quotations omitted). Of course, if probable cause "exists, any argument that the arrestee's speech as opposed to her criminal conduct was the

motivation for her arrest must fail, no matter how clearly that speech may be protected by the First Amendment." *Mesa*, 543 F.3d at 273. But there is no mention, in Plaintiff's Amended Complaint, of a secondary reason for the arrest beyond the speech itself. When read in the light most favorable to Plaintiff, the alleged facts suggest that the Deputies' behavior was objectively unreasonable. Therefore, the Deputies are not entitled to qualified immunity as to Plaintiff's First Amendment claim.

Third, Plaintiff asserts that the Deputies violated his Fourth Amendment rights by using excessive force. The excessive use of force by a law enforcement officer on an individual "in the context of an arrest or investigatory stop" constitutes an "unreasonable seizure" of the individual, in violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must establish: (1) an injury; (2) that the injury resulted directly from the use of excessive force; and (3) that the excessiveness of the force was unreasonable." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007)). The asserted injury, however, must be more than *de minimis*. *Freeman*, 483 F.3d at 416. "The determination of whether a plaintiff's alleged injury is sufficient to support an excessive force claim is context-dependent and is 'directly related to the amount of force that is constitutionally permissible under the circumstances.'" *Id.* (quoting *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996)). Factors to consider, in assessing whether the force is "excessive" or "unreasonable," "include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).

According to Plaintiff's Amended Complaint, he suffered more than a *de minimis* injury. Indeed, Plaintiff explains that he underwent major abdominal surgery to repair the damage caused by Defendants, and furthermore that he faces the necessity of total abdominal wall reconstructive surgery. (Am. Compl. ¶¶ 96-98.) Additionally, the injury allegedly resulted directly from the use of force. Furthermore, reading the facts in the light most favorable to Plaintiff, they do not suggest that Plaintiff was attempting to flee, had committed a serious crime, or posed a threat to the Deputies' safety. Under the facts alleged in the Complaint, then, the Deputies' actions were not reasonable. When Plaintiff was attacked by the Deputies, he "had a clearly established right to be free from excessive force, and it was clearly established that the amount of force that the officers could use depended on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee." *Deville*, 567 F.3d at 169. Therefore, the Deputies are not entitled to qualified immunity as to Plaintiff's excessive force claim.

Fourth, Plaintiff alleges that the Deputies failed to provide him with reasonable medical care. "The Due Process Clause of the Fourteenth Amendment guarantees that a person detained by the police is entitled to medical care." *Carter v. Reach*, 399 Fed.Appx. 941, 942 (5th Cir. 2010) (citing *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000)). Officers violate that right if they are deliberately indifferent to a serious illness or injury. *Id.* (citing *Jacobs*, 228 F.3d at 393). "Deliberate indifference encompasses only 'unnecessary and wanton infliction of pain' or acts

'repugnant to the conscience of mankind.'" *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Plaintiff has not pleaded facts showing that the Deputies were deliberately indifferent to a serious illness or injury. In fact, the Deputies called for EMTs. Shortly after the EMTs departed, the Deputies took Plaintiff to the hospital. The Deputies may have taken longer than Plaintiff would have preferred, but the allegations do not rise to the level of unnecessary and wanton infliction of pain or acts repugnant to the conscience of mankind. The Deputies' actions were simply not objectively unreasonable in light of clearly established law. Therefore, the Deputies are entitled to qualified immunity on Plaintiff's deliberate indifference to medical care claim.

Fifth, Plaintiff alleges that he was unlawfully detained.[2] A claim of unlawful detention "implicate[s] the Fourth Amendment's proscription against unreasonable seizures." *Peterson*, 588 F.3d at 845 (citing *Terry*, 392 U.S. at 16 n.16, 88 S.Ct. 1868). "A police officer may detain an individual for a short period of time if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks evidence rising to the level of probable cause." *Coons v. Lain*, 277 Fed.Appx. 467, 470 (5th Cir. 2008) (unpublished) (citing *Michigan v. Summers*, 452 U.S. 692, 699, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *Terry*, 392 U.S. at 30, 88 S.Ct. 1868). "To state a claim for unlawful detention, a plaintiff must allege: (1) a detention occurred; and (2) the detention was not based on reasonable suspicion supported by articulable facts that criminal activity was occurring." *Id.* (citing *Terry*, 392 U.S. at 30, 88 S.Ct. 1868). *See also Vouchides*, 2011 WL 4592057, at *9. "Reasonable suspicion means

---

[2] Plaintiff states that Defendants violated his constitutional rights "by illegally detaining [him] and preventing him from receiving timely medical care for a heart attack symptoms [sic], of which they were specifically aware, while in custody." (Am. Compl. ¶ 126.) The Court interprets Plaintiff's allegation to mean that he is bringing a claim for unlawful detention.

suspicion that is 'supported by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion.'" *Gonzales v. City of Corpus Christi*, No. C.A. C-05-280, 2006 WL 213980, at *3 (S.D. Tex. Jan. 25, 2006) (quoting *U.S. v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994)). To the extent *Terry* stops on front lawns are permissible,[3] Plaintiff's Amended Complaint pleads no facts showing reasonable suspicion. Reading Plaintiff's Amended Complaint in the light most favorable to Plaintiff, the Deputies' actions were not objectively reasonable in the wake of clearly established law. As such, the Deputies are not entitled to qualified immunity as to Plaintiff's unlawful detention claim.

### E.  Plaintiff's State Claims

Plaintiff does not appear to allege state law tort claims. To the extent Plaintiff does intend to plead state law tort claims, they are dismissed for the reasons articulated in the Court's January 2011 Memorandum and Order. Plaintiff mentions in his conclusion that Defendants' actions are "contrary to Article 1, Sections 9 and 19 of the Constitution of the State of Texas." (Am. Compl. ¶ 148.) Article I, sections 9 and 19 of the Texas State Constitution correspond with the Fourth and Fourteenth Amendments of the United States Constitution, respectively. *Gates v. Texas Dept. of Protective and Regulatory Services*, 537 F.3d 404, 437-38 (5th Cir. 2008). The Court concludes that Plaintiff's claims under section 19 should be dismissed for the same reasons Plaintiff's Fourteenth Amendment claim must be dismissed. *Id.* Likewise, the Court concludes that Plaintiff's

---

[3] Several courts have concluded that *Terry* stops on detainees' front yards are lawful. *See U.S. v. Wade*, No. 4:11–cr–9, 2012 WL 263101, at *4 (E.D. Tenn. Jan. 30, 2012) ("[T]he United States Court of Appeals for the Sixth Circuit has permitted and held as reasonable stops conducted in front of private homes." (citing *O'Malley v. City of Flint*, 652 F.3d 662, 670 (6th Cir. 2011); *U.S. v. Thomas*, 77 F.App'x 862, 863-64 (6th Cir. 2003); *U.S. v. Clay*, 181 F.App'x 542, 543-44 (6th Cir. 2006))); *U.S. v. Bay*, 662 F.3d 1033, 1036 (8th Cir. 2011) ("[B]eing detained outside of one's home poses no barrier to a lawful *Terry* stop." (citing *U.S. v. Hernandez-Hernandez*, 327 F.3d 703, 706 (8th Cir. 2003) (finding lawful a *Terry* stop that occurred in the detainee's front yard))); *Crumpe v. Bowman*, 53 F.3d 328 (4th Cir. 1995) (table).

Article I, section 9 claims, as with Plaintiff's Fourth Amendment claims for excessive force and unlawful detention, should survive the Motion to Dismiss. However, monetary damages are not available for alleged violations of the Texas Constitution. *Kinnison v. City of San Antonio*, 699 F.Supp.2d 881, 891 (W.D. Tex. 2010); *Olibas v. Gomez*, 481 F.Supp.2d 721, 726 (W.D. Tex. 2006) (citing *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995)). Therefore, Plaintiff's claims under Article I, section 9 of the Texas State Constitution only survive to the extent Plaintiff seeks equitable relief, as "sovereign/governmental immunity does not prohibit suits seeking prospective equitable remedies for violations of one's rights under a state statute or the Texas Constitution." *Cardenas v. City of Laredo, Tex.*, No. L–10–12, 2011 WL 1542882, at *5 (S.D. Tex. April 21, 2011) (citing *City of El Paso v. Heiunrich*, 284 S.W.3d 366, 369-72 (Tex. 2009); *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007); *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 409 (Tex. 1997)).

### F.  Remaining Allegations

Plaintiff also appears to allege that he was pressured to abandon, and was retaliated against because of, his Sheriff's Department complaint. "As a general rule, the First Amendment prohibits not only direct limitations on speech but also adverse government action against an individual because of her exercise of First Amendment freedoms." *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999). To state a First Amendment retaliation claim, a plaintiff must establish three elements: (1) the plaintiff was engaged in constitutionally protected activity; (2) the defendants' actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendants' adverse actions were substantially

motivated against the plaintiff's exercise of constitutionally protected conduct. *Izen v. Catalina*, 398 F.3d 363, 367 (5th Cir. 2005) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)). To the extent Plaintiff states a claim for retaliation, Plaintiff's allegations concern individuals who are not a part of this lawsuit. As explained above, supervisory liability is not available under section 1983, and Plaintiff has not alleged facts showing that there is a pattern or practice of obstructing complaints or retaliation. Therefore, any claims that Plaintiff was pressured to abandon, or retaliated against because of, his complaint with the Sheriff's Department must be dismissed.

## IV.   CONCLUSION

As to the Deputies in their individual capacities, Plaintiff's Fourth Amendment claims for excessive force and unlawful detention, as well as Plaintiff's First Amendment claim, survive the Motion to Dismiss. Additionally, Plaintiff states claims against Montgomery County for excessive force and unlawful detention. Plaintiff's claim under Article I, section 9 of the Texas State Constitution survives to the extent Plaintiff seeks only equitable relief. All other claims are hereby **DISMISSED** with prejudice. Pursuant to a request from Defendants, the Court previously stayed discovery in this matter pending the outcome of the Court's ruling on this Motion. (Doc. No. 29.) The stay on discovery is hereby lifted.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 30th day of April, 2012.

_____

**KEITH P. ELLISON**
**US DISTRICT COURT JUDGE**

31